**[J-38-2023] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 42 WAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered March 30, |
| | : | 2022, at No. 430 WDA 2021, |
| v. | : | affirming the order of the Court of |
| | : | Common Pleas of Erie County |
| | : | entered March 9, 2021, at No. CP- |
| WILLIE JAMES HARDY, | : | 25-CR-0001647-1993. |
| | : | |
| Appellant | : | SUBMITTED:  June 21, 2023 |

## CONCURRING AND DISSENTING OPINION

**JUSTICE MUNDY**                                                      **DECIDED: JUNE 17, 2025**

I agree with some of the majority's conclusions, including the following:  previously-untested evidence may be eligible for DNA testing at the present juncture where newer technology has emerged since the time of trial; previously-tested evidence may be eligible for retesting on the same basis; the statutory "actual innocence" standard is satisfied when the applicant has set forth a *prima facie* case that it is more likely than not no reasonable jury would convict at a new trial where the record is supplemented with hypothetical exculpatory results from the proposed new testing; a *prima facie* case in this context means the applicant has identified the exculpatory results that could, within reason, be obtained from the testing sought, such that every rational, properly-instructed jury presented with those results, together with all of the other trial evidence, would acquit; the DNA court's evaluation of the evidence for this purpose is distinct from a review for evidentiary sufficiency to sustain a guilty verdict; the lower courts erred in disregarding Appellant's redundancy theory as a basis for testing; and the matter should be remanded to the DNA court for further proceedings.  With that said, I respectfully disagree with other

holdings reached by the majority, including that the DNA testing statute as amended in 2018 does not include a timeliness requirement, and that there is no need for the DNA court to receive any evidence on the current state of the art in DNA testing technology. My reasoning follows.

## I. Background

Appellant Willie James Hardy was convicted of first-degree murder in 1996 and sentenced to life in prison.[1]  Since that time, the General Assembly has enacted legislation giving individuals convicted of an offense in Pennsylvania an avenue to obtain DNA testing in an effort to prove their innocence.  *See* 42 Pa.C.S. § 9543.1.  Twenty-four years after his conviction, Appellant applied for DNA testing under that provision in 2020. The questions presented in this appeal by allowance relate to the timeliness of Appellant's request for DNA testing, which items of evidence are eligible for testing at this time, and whether Appellant satisfied the statute's substantive prerequisites for such testing.

Appellant and the victim, Deborah Will (hereinafter, "Deborah"), both worked at Erisco Industries in Erie, Pennsylvania, located on Raspberry Street near the corner of West 18th Street.  Erisco was a factory that made steel wire products.  At some point the two began a romantic relationship and Deborah began living with Appellant.  The relationship ended in January or February of 1993, and Deborah, with her twelve-year-old daughter, moved in with Deborah's brother and his wife.  Appellant sought to rekindle the romance, but his efforts were unsuccessful and Deborah ultimately began dating Kenneth Logan, a development Appellant learned about a few days before Deborah's body was found on the morning of June 22, 1993.

---

[1] Appellant was convicted of first-degree murder in this matter in 1993.  His judgment of sentence was vacated on appeal due to the erroneous admission of hearsay evidence, *see Commonwealth v. Hardy*, 663 A.2d 248 (Pa. Super. 1995) (table), and he was retried by jury in 1996.  Unless otherwise specified, the references herein to Appellant's trial relate to his 1996 trial.

The previous day, June 21, 1993, Deborah, Appellant, and several co-workers worked their regular shift at Erisco, namely, the second shift which lasted from 3:30 to 11:30 p.m. As crew leader, Appellant was in charge of collecting timecards, closing the factory, and setting the burglar alarm at the end of the shift. When Deborah arrived for work that day, she parked her 1975 Chevy Blazer truck in Loading Dock 3, which opened onto Raspberry Street. That loading dock was not used for factory work during the second shift. Parking there was unusual for Deborah as she ordinarily parked in the parking lot. Appellant also parked his motorcycle in Loading Dock 3 that day. Additionally, he asked his supervisor for permission to take the following day off. During the course of the shift, one of Deborah's co-workers noticed Appellant holding a surgical-type glove, something the co-worker had never seen him in possession of before.[2]

At 11:30 p.m., the workers clocked out for the night and most of them left. Deborah, however, stayed in the factory, remaining there with Appellant because he asked her to stay. Deborah was never seen alive again. Appellant, whose timecard showed he punched out at 11:31 p.m., did not set the alarm until 11:52 p.m.[3]

The following morning, Logan arrived at the factory inquiring if anyone had seen Deborah. Randy Luce, the first-shift supervisor, told Logan someone at the factory mentioned seeing a truck like Deborah's about one block from the factory along 19th Street. Luce and Logan went outside and found the truck with Deborah's body inside. They both touched the outside of the truck, and Logan entered through one of the front doors while Luce went back to the factory to call the police.

---

[2] *See* N.T., April 22, 1996, at 89-90, *reprinted in* RR. 1866a-1867a (testimony of Kaye Irwin).

[3] The Erisco general manager testified that on the night in question, Appellant was the only employee who had access to the four-digit code used to activate the alarm. *See* N.T., April 24, 1996, at 81, *reprinted in* RR. 2384a (testimony of Phillip Zachs).

The truck was found on the north side of 19th Street pointing east, and it was situated next to railroad tracks in a trash-strewn area used for parking by tenants of a nearby building and frequented by prostitutes. There was eyewitness testimony from a neighborhood resident indicating the truck was placed at that spot between 11:30 and 11:50 p.m.[4] Deborah's body was in the truck bed in the back with the tailgate door locked. Her body was covered in dirt and bruises, and a twine cord was wrapped around her neck. Her clothing was noticeably more soiled than it had been at the end of her shift the previous night. However, it was not ripped, torn, pulled up, or pulled off, and it was fully buttoned – all of which suggested sexual assault was not a motive.[5] As well, cash, credit cards, and a watch were found on the vehicle's front seat, thus also appearing to exclude robbery as a motive.

The autopsy results indicated Deborah suffered a blunt force injury to the head. The cause of death was asphyxia due to strangulation. The bruises on her neck and other factors indicated manual strangulation followed by ligature strangulation. The Commonwealth's pathologist estimated that the time of death was between 11:00 p.m. on June 21 and 2:00 a.m. on June 22, 1993. The Commonwealth's pathologist, who had herself performed approximately a thousand autopsies, did not perform the autopsy in this case. She reached her time-of-death conclusion based on photographs of the victim's body, the autopsy report, and a video of the autopsy.

During the afternoon and evening of June 22, 1993, Erie police questioned Appellant about his relationship with Deborah and about the events of the previous day. Appellant admitted the two had been romantically involved and that she had rejected his

---

[4] *See* N.T., April 24, 1996, at 43, 52, *reprinted in* RR. 2346a, 2355a (testimony of Angela Stone). Ms. Stone walked to a corner store at 11:30 and did not see the truck. When she walked home at around 11:50, she saw it parked where it was found the next morning.

[5] No evidence of sexual assault was ever found.

pleas for reconciliation. He initially cooperated with the investigation, allowing the police to search his residence and seize some of his clothing. He accompanied the police back to the factory, where he demonstrated several times how he had closed down the factory the previous night. The police timed these demonstrations and concluded he could not account for 14 minutes of his time.[6] After further questioning, Appellant invoked his right to counsel. He was eventually charged with, *inter alia*, one count of murder. *See* 18 Pa.C.S. § 2502.

As the investigation unfolded, the physical evidence did not directly link Appellant to the killing, but it did suggest a connection between the killing and the factory. A Pennsylvania State Police forensic scientist testified the cord used to strangle Deborah was made of twine that matched the twine located in the factory in terms of its length, composition, and the specific type of knot that was used.[7] The same scientist stated the dirt on the factory floor contained a unique mixture of components that matched the samples taken from Deborah's soiled clothing. Scrapings from Deborah's fingernails included that same type of dirt, and none of Deborah's clothes had any grass, weed, or

---

[6] The police made a videotape of Appellant reenacting his movements, which was played for the jury. From the reenactment it appeared Appellant would have set the alarm at approximately 11:38 p.m. the previous night. The detective concluded from this that there was a 14-minute gap that was unaccounted for.

Other testimony indicated there would have been a 90-second delay from when the code was punched into the alarm, to when the alarm system reflected it was fully armed. *See* N.T., April 30, 1996, at 67, *reprinted in* RR. 3291a (testimony of Timothy Furman). Thus, it is possible the gap was closer to 12 minutes than 14 minutes. In any event, these time periods are estimates as there is no evidence the clock at the factory was synchronized with the clock at the alarm company that provided the 11:52 time stamp. *See id*. at 67-68, *reprinted in* RR. 3291a-3292a.

[7] The twine was cut from stacks of cardboard shipping cartons that Erisco received from a supplier. The lead detective's investigation determined that the supplier did not deliver stacks of boxes to any other factory in the area. *See* N.T., April 29, 1996, at 56, *reprinted in* RR. 3043a (testimony of Detective David Bagnoni).

soil particles. Additionally, next to Deborah's body in the back of her vehicle, investigators found an octagonal bolt that was missing from the accordion gate just outside Loading Dock 3.[8] Furthermore, Erisco's maintenance foreman found a pair of sunglasses matching those worn by both Deborah and Appellant on the ground in Loading Dock 3, just behind where Deborah's truck had been parked the previous night. *See* N.T., April 23, 1996, at 41-42, *reprinted in* RR. 2076a-2077a.

Two eyewitnesses supplied testimony concerning the interval from when the shift ended at 11:30 to 11:52 p.m. when the alarm was set. At about 11:49 p.m., Erie Police Officer Stephen Franklin was driving slowly along Raspberry Street when he looked toward Loading Dock 3 and saw a motorcycle coming out of the loading dock entrance. The motorcycle matched the one driven by Appellant based on the size and placement of the running lights beneath the windshield. The officer could see that the accordion gate was open, the overhead door was partially open and in the process of opening, and some of the interior lights of the factory were still on behind the motorcycle.

Separately, Dale Teribery, a second-shift worker, left the factory at 11:31 p.m. but stayed in his car waiting for Deborah to leave the building.[9] At Deborah's request he waited in his car for her in an alleyway next to the factory. However, he never saw her come out of the factory. At some point he noticed the lights go on in Loading Dock 3, and he waited in his car an additional eight or ten minutes. After seeing what he thought was Deborah's truck on Raspberry Street, he drove out of the alley and discovered it was not her truck. He then drove past Loading Dock 3 and noticed that the lights were still on in

---

[8] Loading Dock 3 also had an overhead door that, if it was open due to the warm weather (which it was on the night in question), was closed at the end of the second shift. The accordion gate was an additional security structure just outside the overhead door.

[9] Teribery's claim to have left the factory and waited in his car was corroborated by another second-shift worker. *See* N.T., April 24, 1996, at 167, *reprinted in* RR. 2470a (testimony of Kevin VanTassel).

the dock area and the overhead door and accordion gate were closed. When he drove an extra block, turned his car around, and drove past the loading dock a second time, he noticed the lights were off and the door and gate were still shut. Thinking Deborah had left, he drove home. Based on his experience operating those doors, he concluded that in the short time it took him to turn around and drive by the loading dock a second time, it would have been impossible for someone to have opened the door and gate, exited the loading dock, and closed them again. The police timed Teribery as he re-enacted his drive past Erisco. From the reenactment, they determined Teribery left the factory at about 11:45 p.m.[10]

The investigating detective referred to Teribery's description when questioning Appellant about the 14-minute gap on June 22, 1993, less than 24 hours after these events. At first Appellant could not explain this gap, but after repeated questioning he suggested he might have sat outside on his motorcycle during the interval. When the detective mentioned that that would be inconsistent with Teribery's account, Appellant changed his mind again and said he might have asked Deborah to stay inside the factory and talk to him. This, in turn, led to a more in-depth discussion concerning Appellant's relationship with Deborah. According to the detective, Appellant explained he had been repeatedly trying to convince Deborah to reinstitute their romance and he thought about her all the time. His requests became so persistent that Deborah had told him to "quit begging." N.T., April 29, 1996, at 49, *reprinted in* RR. 3036a (testimony of Detective

---

[10] Teribery testified he did not work the following day, June 22, 1993, because he was "too upset" about Deborah's death. Although he did not expressly state how he learned of the killing, he did refer to a television news broadcast he had seen. N.T., April 22, 1996, at 40, *reprinted in* RR. 1817a.

David Bagnoni). Appellant noted he did not react negatively to that remark because of the mental disciplines he had learned through his martial-arts training.[11]

Four items of evidence underwent DNA testing prior to trial: (1) small pieces of flesh found under Deborah's nails; (2) semen and vaginal fluid from a used condom found near Deborah's car; (3) semen retrieved from Deborah's underwear and vaginal swab; and (4) blood from her shirt.[12] The testing excluded Appellant as a contributor to the DNA for each of these items. The semen found in and around Deborah's vagina was identified as belonging to her paramour, Kenneth Logan, who testified he had had intercourse with Deborah sometime before she started work on June 21, 1993.[13] The semen from the condom excluded both Logan and Appellant. The vaginal fluid from the condom did not

---

[11] Appellant had a black belt in karate and was a karate and weightlifting instructor.

[12] In addition to the condom, a business card from a men's health club and a used tissue were found not far from Deborah's truck, but they were not tested for DNA.

[13] Appellant presently implies that Logan acted suspiciously by intentionally omitting that detail when he first talked to the police. *See* Motion at ¶34, *reprinted in* RR. 23a (asserting that Logan "withheld critical information from the police," which became clear during Appellant's first trial when a police detective "testified that upon arriving at the scene, he spoke with Mr. Logan who indicated that he had only *spoken* with Ms. Will that afternoon") (citing N.T., Dec. 8, 1993, at 146) (emphasis in original). The 1993 trial transcript does not support Appellant's description. It reflects, rather, that the detective who spoke with Logan shortly after Logan discovered Deborah's vehicle answered a question at trial within the scope of what was asked. The prosecutor asked, "Did [Logan] indicate to you when the last time was that he spoke to the victim?" The detective answered, "He had stated that he spoke to her, I believe it was like 2:30 or 2:45 the prior afternoon." N.T., Dec. 8, 1993, at 146 (testimony of Detective Steven Goozdich).

While it may be true that Logan did not, for whatever reason, immediately reveal to the detective that he had had intercourse with Deborah on June 21, 1993, there is no basis in the record to believe he intentionally "withheld critical information." In fact, Logan did divulge that information once he realized it was relevant to the investigation. *See* N.T., April 23, 1996, at 125, *reprinted in* RR. 2160a ("Q: When did you tell the police that you had made love to her on that afternoon? A: It was – came back to me that they checked her panties out, and I admitted that I made love to her that day.").

match Deborah. The blood on Deborah's shirt was her own, as was the flesh retrieved from under her nails.

The police did not focus their investigation on Logan because he was able to establish that he was at his own place of employment during the relevant timeframe. He was employed by Lord Corporation, where he worked the 11:00 p.m. to 7:00 a.m. shift. Lord manufactured helicopter parts for military and civilian use, and for security reasons the Lord factory was surrounded by a barbed-wire fence and had a security gate with a guard's station, which was the only point of entry or egress for employees. The gate was locked 30 minutes after the shift started and employees were not allowed to leave in the middle of the shift. Logan's account that he was working at Lord throughout the night of the murder was corroborated by a fellow employee, Walter Tiebolt, who worked the same shift as Logan. At trial, Tiebolt described how, due to the open layout of the department where he and Logan worked, they would only lose sight of each other for brief periods when one of them used the restroom. Tiebolt testified that on June 21, 1993, Logan worked his entire shift. Tiebolt and Logan left the factory together at 7:00 the next morning.[14] Tiebolt also recounted that Logan became upset when he did not receive a call from Deborah at midnight that night, as she would customarily call him from her home at that time to chat after she completed her Erisco shift.

Based on all of this evidence, the Commonwealth's theory of the case was that after the Erisco shift ended and all other workers had left the building, Appellant killed Deborah inside the factory and placed her body in the back of her truck. According to the Commonwealth, Appellant then drove Deborah's truck out of the loading dock; went back in and closed the overhead door; drove Deborah's truck to the place it was found one

---

[14] Logan's timecard, which was signed by his foreman at the end of the week, also reflected that he was present at work during those hours for his June 21-22, 1993, shift. *See* N.T., April 23, 1996, at 99, *reprinted in* RR. 2134a.

block away; sprinted back to the factory and entered through a man door that was propped open;[15] reopened the overhead door; drove his motorcycle out as it was opening up (just as Officer Franklin was passing by on Raspberry Street); went back in, closed up, activated the alarm, and left.

The defense called several character witnesses who testified to Appellant's peaceful reputation in the community, including the martial-arts community. It additionally presented the testimony of an expert in analytical chemistry who opined that it could not be established to a reasonable degree of scientific certainty that the dirt from Deborah's clothing matched the dirt from the factory floor. There was also conflicting evidence as to the approximate time of death. Whereas the Commonwealth's evidence suggested a timeframe that included the crucial interval from 11:30 to 11:52 p.m. on June 21, 1993, the doctor who performed the autopsy opined it was later than that – between approximately 5:30 and 7:30 a.m. on the morning of June 22, 1993. Finally, the defense called witnesses whose testimony was designed to cast doubt on the idea that Appellant was fixated on getting back together with Deborah. One woman testified she had been carrying on an extramarital affair with Appellant and planned to leave her husband and move in with him on June 22, 1993. Another woman stated that at the time of the killing, she was in a romantic relationship with Appellant which began in early June 1993 when the two were filming a movie together.

The jury found Appellant guilty of first-degree murder, and the court sentenced him to life without parole. *See* 18 Pa.C.S. § 1102. On direct review, the Superior Court affirmed Appellant's judgment of sentence and this Court denied further review.

---

[15] In commercial and industrial settings, a man door is a pedestrian-sized doorway designed for human traffic. There was evidence that the man door used by second-shift workers at Erisco could easily be propped open. *See* N.T., April 19, 1996, at 95, *reprinted in* RR. 1654a (testimony of Dale Teribery).

*Commonwealth v. Hardy*, 714 A.2d 1084 (Pa. Super.) (table), *appeal denied*, 727 A.2d 128 (Pa. 1998). Appellant timely sought relief under the Post Conviction Relief Act (PCRA),[16] but his efforts were unsuccessful. *See Commonwealth v. Hardy*, 777 A.2d 502 (Pa. Super.) (table), *appeal denied*, 782 A.2d 542 (Pa. 2001). The present litigation stems from Appellant's renewed attempt to obtain post-conviction relief, this time through a new round of DNA testing.

## II. Further DNA testing

### A. Legislation

In 2002, the General Assembly enacted legislation adding Section 9543.1 to Subchapter 95(B) of the Judicial Code, which relates to post-conviction relief. Although Subchapter 95(B) also contains the PCRA, Section 9543.1 is not part of the PCRA proper. *See Commonwealth v. Scarborough*, 64 A.3d 602, 609-10 (Pa. 2013). It thus does not encompass the one-year time bar for PCRA petitions.

Section 9543.1 gives incarcerated individuals the ability to apply by written motion for DNA testing on specific items of evidence involved in the investigation or prosecution that led to their conviction. *See* 42 Pa.C.S. § 9543.1(a). The provision gives the Commonwealth the ability to respond to the motion and obligates it and the court to preserve the evidence pending completion of the proceedings. *See id*. § 9543.1(b). It also mandates that the applicant take certain procedural steps such as identifying the evidence; consenting to provide bodily fluid samples for DNA comparison; asserting actual innocence of the offense in question; asserting that demonstrating such innocence is the reason for the motion; and presenting a *prima facie* case that the perpetrator's identity was at issue in the case and that the DNA testing sought, assuming exculpatory results, would establish the applicant's actual innocence. *See id*. § 9543.1(c).

---

[16] Act of May 13, 1982, P.L. 417, No. 122 (as amended 42 Pa.C.S. §§ 9541-9546).

Section 9543.1 directs the court to review the trial record and require the testing if the above prerequisites are met, the evidence in question has been subject to a chain of custody ensuring it was never materially altered, and the motion was made "in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." *Id.* § 9543.1(d)(1)(iii).[17] On the other hand, it states the court may not order DNA testing if there is no reasonable possibility it will produce exculpatory evidence that would establish actual innocence. *See id.* § 9543.1(d)(2).

The results of DNA tested pursuant to Section 9543.1 are intended to form the basis for a new PCRA petition implicating the newly-discovered-facts predicate for relief, *see* 42 Pa.C.S. § 9543(a)(2)(vi), which comprises an exception to the PCRA's one-year time bar. *See id.* § 9545(b)(1) (providing that absent such an exception, a PCRA petition must be filed within one year of the date the judgment becomes final). As enacted in 2002, Section 9543.1 expressly tracked the then-applicable 60-day period for the filing of a PCRA petition based on newly-discovered facts, *see id.* §§ 9543.1(f)(1) (2002), 9545(b)(2) (1995), with the clock starting to run at the time the applicant was notified of the DNA test results. That time limitation was expanded to one year via a 2018 legislative change, known as Act 147,[18] which is in keeping with the PCRA's own similar time-limit expansion under Section 9545(b)(2) enacted the same day under Act 146.[19]

---

[17] The specific meaning of this phrase is presently in dispute. It is analyzed below.

[18] Act of Oct. 24, 2018, P.L. 896, No. 147, § 1 (amending, *inter alia*, 42 Pa.C.S. § 9543.1). The changes made by Act 147 to Section 9543.1 are shown in the Appendix to this Opinion.

[19] *See* 42 Pa.C.S. § 9545(b)(2), *as amended by* Act of Oct. 24, 2018, P.L. 894, No. 146. If the subsequent PCRA petition is timely filed, relief is potentially available under Section 9543(a)(2)(vi). *See* 42 Pa.C.S. § 9543.1(f)(1), (3). While PCRA litigation is generally limited to persons still serving a criminal sentence, *see Commonwealth v. O'Berg*, 880 A.2d 597, 599 (Pa. 2005), Act 146 added a provision whereby wrongfully-convicted (continued…)

Act 147 made other changes that more directly impact the present case. Section 9543.1 previously authorized only incarcerated persons (including those on death row) to apply for DNA testing; Act 147 deleted that requirement and specified that any individual convicted of an offense in Pennsylvania may file such a motion "at any time." 42 Pa.C.S. § 9543.1(a)(1). While the extension of such authorization to non-incarcerated persons does not affect Appellant, the "at any time" language chosen by the General Assembly raises the question: is paragraph (a)(1)'s use of that particular phrase intended solely to effectuate such extension, or was it intended to negate the "timely manner" prerequisite reflected in paragraph (d)(1)(iii) as developed above, which survived the changes made by Act 147? To compound the confusion, Act 147 added a new paragraph to subsection (a) that juxtaposes the two phrases, providing that "DNA testing may be sought *at any time if the motion is made in a timely manner* . . .." *Id*. § 9543.1(a)(4) (emphasis added).[20] These revisions are analyzed below.

There are two other prerequisites to DNA testing under Section 9543.1 that are presently in issue. First, and as noted, the person seeking testing must present a *prima facie* case demonstrating that DNA testing of the specific evidence would establish his actual innocence, assuming exculpatory results. *See* 42 Pa.C.S. §§ 9543.1(c)(3), 9543.1(a)(6). Additionally, and this is an innovation contained in the 2018 legislation, for evidence that was already DNA-tested at the time of trial, re-testing may be ordered if "newer technology could provide substantially more accurate and substantially probative results[.]" *Id*. § 9543.1(a)(2). These facets of the statute are also discussed below.

---

individuals who have completed their sentence may file a petition seeking relief based on new DNA evidence obtained per Section 9543.1. *See* 42 Pa.C.S. § 9543(a)(1)(iv).

[20] The phrase recalls an observation attributed to Henry Ford concerning the Model T – that the customer could have the vehicle in any color as long as it was black. *See Sanchez v. State of Colo.*, 97 F.3d 1303, 1317 n.24 (10th Cir. 1996).

## B. Procedural history

### 1. Pleadings

In 2020, 24 years after his trial, Appellant filed a motion for post-conviction DNA testing pursuant to Section 9543.1. That motion is the subject of this appeal. In it, Appellant emphasized that DNA testing technology was rudimentary at the time of his trial. Among other deficiencies, the testing at the time required comparatively large amounts of biological material. Therefore, testing was not done for items that were touched by the perpetrator but lacked sufficient testable biology, such as the twine cord found around Deborah's neck. At the present juncture, DNA testing technology has improved to the point where even trace amounts of DNA left on such items can be recovered and tested. Appellant therefore requested post-conviction DNA testing of various pieces of evidence obtained from the crime scene, including the twine cord; the clothing worn by Deborah during the attack; the scrapings from under her fingernails; the finger and palm prints lifted from the interior and exterior of Deborah's car; her car keys; her purse; various items from inside her purse; the octagonal bolt found next to her body evidently from the Erisco accordion gate; the condom found outside Deborah's car; a tissue with seminal fluid found near her car; vaginal smears from the rape kit; and a men's health club business card found near her car.[21]

In his motion, Appellant relied on Section 9543.1, as amended in 2018, which now allows post-conviction DNA testing for evidence that was previously tested, "but newer technology could provide substantially more accurate and substantially probative results."

---

[21] Appellant also requested that the DNA profile previously obtained from the condom be uploaded to state and federal DNA databases. He asserted that pretrial testing of the condom DNA excluded him, an unsolved rape occurred in the same area three days before Deborah's murder, and a hit from the condom DNA could potentially determine who killed Deborah and committed the rape.

42 Pa.C.S. § 9543.1(a)(2).[22]  He also requested a new round of testing based on statutory language permitting post-conviction DNA testing where evidence was not previously tested because "the technology for testing was not in existence at the time of the trial[.]" *Id*.  Appellant continued that post-conviction DNA testing is warranted because none of the evidence, even the previously-tested items, was subject to the advanced DNA testing technologies available today.  In this latter regard, Appellant requested Short Tandem Repeat ("STR") DNA testing, including STR's derivatives and related offshoots:  Y-STR (which "sees" only male DNA), miniFiler, and mitochondrial DNA testing.[23]  He alleged that the Pennsylvania State Police did not employ STR testing until 2000, seven years after testing occurred in this case and four years after his trial.

Appellant's motion included a variety of articles explaining the technological advancements provided by STR testing, such as its substantially increased reliability and its ability to generate DNA profiles from tiny amounts of biological material left on surfaces (such as traces of blood, semen, skin cells, sweat, or mucus) even when those samples were degraded or mixed from multiple donors; and he averred that these techniques can now be used to analyze "touch DNA" or "contact trace DNA," which is DNA extracted from skin cells left behind when a person touches an object.  Overall, Appellant maintained that STR testing has revolutionized the capacity of DNA testing and can provide results

---

[22] In this regard, Appellant asserted that although testing was done in 1993 on the blood on Deborah's shirt, the condom, Deborah's undergarments, and her fingernail scrapings, such testing was polymerase chain reaction ("PCR") and DQ-Alpha based testing.  These methods are considered primitive by today's standards.

[23] Mitochondrial DNA (mtDNA) comes from a cell's mitochondria rather than its nucleus.  Whereas nuclear DNA is inherited from the father and mother and is thus unique for each individual (except identical twins), mtDNA is only inherited from the mother, so that all persons having a common maternal ancestor will have common mtDNA.  *See Commonwealth v. Chmiel*, 30 A.3d 1111, 1124 n.3, 1155 (Pa. 2011).  mtDNA can be useful when biological samples are too degraded for nuclear DNA testing.  *See State v. Council*, 515 S.E.2d 508, 516 n.12 (S.C. 1999).

that were impossible to obtain during his trial – and that as such it has been used to exonerate some wrongly-convicted defendants and confirm the convictions of others. He added that with the new STR testing, it is feasible to find a match by uploading the obtained profiles into the Combined DNA Index System (CODIS) run by the FBI.[24] This, according to Appellant, could in turn identify persons who are "included" as a possible source – a capability that was unavailable at the time of the 1993 investigation.

In his motion, Appellant explained that the perpetrator's identity was at issue during his trial. He also emphasized that Section 9543.1 only requires him to present a *prima facie* case that the DNA testing, assuming exculpatory results, would establish his "actual innocence" – a term, Appellant proffered, meaning it is more likely than not that any reasonable juror reviewing the newly-supplemented record would harbor a reasonable doubt about his guilt. Appellant recognized he has already been excluded as a source of DNA from all evidence that was previously tested. Nevertheless, he argued the absence of his DNA coupled with the presence of someone else's DNA on the untested items, most notably the twine used to strangle Deborah, would be persuasive proof of innocence. He developed that this would suggest his innocence if that other person's DNA were to be found on multiple pieces of evidence. Conversely, if located only on a

---

[24] CODIS is the "generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases. The National DNA Index System or NDIS is considered one part of CODIS, the national level, containing the DNA profiles contributed by federal, state, and local participating forensic laboratories." https://www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy/codis-and-ndis-fact-sheet (accessed May ___, 2025); *see also Maryland v. King*, 569 U.S. 435, 444-45 (2013); *id*. at 472-73 (Scalia, J., dissenting).

Stated in a simplified form, CODIS maintains an index of DNA profiles of convicted offenders (offender index), as well as a separate index of DNA profiles of unknown persons derived from biological samples left at crime scenes (forensic index). *See Allen v. State*, 103 A.3d 700, 710 (Md. 2014). *See generally* Suzanne Bell & John M. Butler, Understanding Forensic DNA 80-84 (Cambridge Univ. Press 2022) (Bell & Butler).

single piece of evidence, that DNA could still be checked against a databank to produce a possible "hit," which could then be used by the police to confront the person and potentially obtain a confession to the underlying crime.[25]  Thus, Appellant claimed he satisfied all statutory requirements under Section 9543.1 and was entitled to post-conviction DNA testing.

The Commonwealth responded, *see* 42 Pa.C.S. § 9543.1(b)(1) (affording the Commonwealth an opportunity to respond to the motion), arguing Appellant's motion should be denied as untimely and for failing to meet the statutory requirements for DNA testing.  As for timeliness, the Commonwealth cited *Commonwealth v. Edmiston*, 65 A.3d 339 (Pa. 2013), *overruled on other grounds by Commonwealth v. Small*, 238 A.3d 1267 (Pa. 2020), in which this Court assessed timeliness in the context of a Section 9543.1 motion for post-conviction DNA testing.[26]  The Commonwealth argued all of the evidence for which Appellant seeks post-conviction DNA testing has been available since the time of trial, and some has already been tested.  The Commonwealth continued that although Section 9543.1 was enacted in 2002, Appellant waited over 18 years to file the present motion.  Thus, the Commonwealth suggested there are no circumstances under which Appellant's 2020 motion can be considered timely.

The Commonwealth also asserted Appellant failed to make out a *prima facie* showing of actual innocence.  According to the Commonwealth, the absence of

---

[25] Appellant referred to these possibilities as the redundancy theory, the databank theory, and the confession theory.  *See generally Commonwealth v. Conway*, 14 A.3d 101, 110 (Pa. Super. 2011) (involving these theories).  The confession theory depends on the fruits of the data bank theory to identify the individual for the police to confront.

[26] As discussed more fully *infra*, this Court concluded that Edmiston's decision not to seek testing during trial or during his prolonged PCRA proceedings, despite having access to the evidence and the means to test it, established that his motion for DNA testing was not made "in a timely manner and for the purpose of demonstrating [his] actual innocence and not to delay the execution of sentence or administration of justice."  *Edmiston*, 65 A.3d at 358-59.

Appellant's DNA and the presence of another person's DNA on the evidence would not establish innocence because "absence of evidence is not evidence of absence." *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa. Super. 2005). Moreover, the Commonwealth emphasized that all of the items at issue were likely touched by multiple people, including the twine that presumably came from the Erisco plant and was previously used for shipping, Deborah's vehicle to which her boyfriend had access, and the accordion gate bolt. The Commonwealth additionally summarized the inculpatory trial evidence, concluding that although it was circumstantial, it compellingly demonstrated Appellant's guilt. *See generally Commonwealth v. Johnson*, 107 A.3d 52, 66 (Pa. 2014) (noting guilt beyond a reasonable doubt can be proved through wholly circumstantial evidence). The Commonwealth thus suggested the present motion is a "Hail Mary" attempt to distract from that evidence.

Appellant filed a reply to which it attached an affidavit of Alan Keel, describing the changes in DNA testing technology that have taken place since the 1990s. The Keel affidavit is discussed below.

### 2. Lower court rulings and this Court's further review

The DNA court denied Appellant's motion for post-conviction DNA testing.[27] The court expressed that a motion for DNA testing may only be granted if it is timely and it establishes a *prima facie* case that favorable results would establish actual innocence. *See Commonwealth v. Hardy*, No. 1647 of 1993, *slip op.* at 12 (C.P. Erie Mar. 9, 2021). Addressing this latter topic first, the court held that testing of the previously-tested items, such as the blood on Deborah's shirt, her fingernail scrapings, and the condom found

---

[27] The term "DNA court" is used herein to refer to the common pleas court in which the motion for DNA testing was made – which, under the statute, is the sentencing court. I do not use the term "PCRA court" because, as mentioned, Section 9543.1 is not part of the PCRA.

nearby, could not establish actual innocence even if exculpatory results were obtained. The court reasoned that the pretrial DNA testing of such items already excluded Appellant as a contributor, and Deborah had no apparent connection to the condom found near her car. Thus, further testing in an effort to prove innocence would be futile. *See id*. at 13-14 ("This is not a case where prior DNA results were inconclusive or could not exclude Petitioner as a possible contributor of DNA."). In relation to things that were not tested pretrial, the court faulted Appellant for not utilizing the then-extant DNA testing technology. The court indicated that merely because touch DNA testing was at that time a "long shot," that did not negate an "implicit requirement" the court gleaned from Section 9543.1(a)(2) as to verdicts rendered after January 1, 1995, that DNA testing must have been sought at that time. *Id*. at 14.

In terms of the motion's timeliness, the court primarily compared the present situation to the one that arose in *Edmiston*, where we disallowed DNA testing under an untimeliness rationale. For example, whereas the defendant in that matter waited until six years after the statute was enacted in 2002 to file his motion, *see Edmiston*, 65 A.3d at 356, Appellant waited 18 years. Also, the court rejected Appellant's reliance on paragraph (a)(4)'s indication that a motion for DNA testing may be filed "at any time," because the statute also expressly requires the motion be made "in a timely manner." *Hardy*, No. 1647 of 1993, *slip op*. at 16-17 (quoting 42 Pa.C.S. § 9543.1(a)(4)).

After the intermediate court affirmed, *see Commonwealth v. Hardy*, 274 A.3d 1240 (Pa. Super. 2022), Appellant petitioned this Court for discretionary review. We granted the petition to address whether Appellant's motion for DNA testing was timely, whether he satisfied the requirements of Section 9543.1(a)(2) in relation to evidence that was previously tested and evidence that was not previously tested, and whether he presented a *prima facie* case demonstrating that the DNA testing sought, assuming exculpatory

results, would establish his actual innocence. *See Commonwealth v. Hardy*, 289 A.3d 889 (Pa. 2022) (*per curiam*).[28]

The threshold issue is timeliness. A DNA court need only consider whether a motion for DNA testing satisfies the substantive requirements of Section 9543.1 if it is timely.[29] If it is, then the question of whether the applicant set forth a *prima facie* case that the results of such testing, if exculpatory, would establish his actual innocence, becomes salient. Before that judgment can be made in the present case, however, the question of what evidence is eligible for testing must be determined. That is why the second question pertains to whether the previously-tested evidence and the previously-untested evidence identified by Appellant are eligible to be tested at this juncture.[30]

### III. Threshold considerations: timeliness and purpose

### A. Interpretation

Although timeliness is nominally the only threshold issue before this Court, Section 9543.1 groups other factors together with timeliness – in particular, the requirement that

---

[28] The specific questions encompassed by our order granting review are: "(1) Was Appellant's Petition for Post-Conviction DNA Testing Pursuant to 42 Pa.C.S. § 9543.1 timely? (2) Did Appellant satisfy the requirements of 42 Pa.C.S. § 9543.1(a)(2), with regard to evidence previously tested for DNA and evidence not previously tested for DNA? (3) Did Appellant present a *prima facie* case demonstrating that the DNA testing sought, assuming exculpatory results, would establish his actual innocence of the offense for which he was convicted?" *Id*.

[29] This is not necessarily to say that timeliness is jurisdictional, and thus non-waivable, in the present setting. While the Superior Court has held it is not jurisdictional, *see In re Payne*, 129 A.3d 456, 555 n.12 (Pa. Super. 2015) (*en banc*), this Court need not presently express any opinion on the matter as the question is not before us.

[30] Reviewing courts assess whether the DNA court's ruling is supported by record evidence and free from legal error. *See Commonwealth v. Wright*, 14 A.3d 798, 814 (Pa. 2011). As to questions of law, including statutory interpretation or construction, this Court's review is *de novo* and plenary. *See Shrom v. Pa. Underground Storage Tank Indem. Bd.*, 292 A.3d 894, 907 (Pa. 2023).

the motion be made for the purpose of demonstrating actual innocence and not for reasons of delay. The statute states, in relevant part:

> DNA testing may be sought at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

42 Pa.C.S. § 9543.1(a)(4) (2018). Although the above was added to the statute in 2018, the same phraseology was used in 2002, and retained in 2018, in subsection (d), which relates to whether the court should order the testing sought in the motion. *See id*. § 9543.1(d)(1)(iii) (2002) (directing the court to order testing upon a determination, *inter alia*, that the "motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice"). A significant question is raised concerning how the phrase, "in a timely manner," relates to the second and third prerequisites, that the motion is made to demonstrate actual innocence, and is not made for reasons of delay – and how those latter preconditions relate to each other. I now turn to that question.

### *1. Introduction – places Section 9543.1 refers to timing*

There are three places where the timing of the motion is mentioned in the governing statute. First, paragraph (a)(1) indicates a person convicted of a criminal offense in Pennsylvania "may apply by making a written motion to the sentencing court at any time for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction." 42 Pa.C.S. § 9543.1(a)(1). As quoted above, subsection (a), which relates to the motion, also states in paragraph (a)(4) that DNA testing "may be sought at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." *Id*. § 9543.1(a)(4).

Thereafter, subsection (d), which governs the DNA court's response to the motion, directs the court to order the testing requested in the motion, but only upon a determination by the court that the motion was "made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." *Id*. § 9543.1(d)(1)(iii).

### *2. Whether timeliness really is required*

These provisions raise interpretive difficulties. If the motion may be made at any time, that would appear to imply the DNA court should never deem a motion untimely. Yet if that were true, it is hard to see why the General Assembly would separately specify that the court may only order testing if the motion is made in a timely manner.

One way to read this language is to view the 2018 addition to subsection (a)(1) of the phrase "at any time," and the simultaneous deletion, from the same sentence, of text that had indicated a motion for DNA testing could only be made by incarcerated persons, as directed to a single objective. Specifically, the 2018 deletion and insertion are as follows:

> An individual convicted of a criminal offense in a court of this Commonwealth ~~and serving a term of imprisonment or awaiting execution because of a sentence of death~~ may apply by making a written motion to the sentencing court **at any time** for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

42 Pa.C.S. § 9543.1(a)(1) (2018). Viewing these two changes as accomplishing a single goal – to expand the class of persons who may apply for forensic DNA testing to include non-incarcerated individuals – would leave intact the concept, reflected elsewhere in Section 9543.1, that a motion is only viable if made in a timely manner, because the "at any time" language would be understood as not relating so much to timeliness as to the incarceration status of the individual. And indeed, that is how the Commonwealth

suggests we read it.  *See* Brief for Commonwealth at 31 n.2 (citing *Commonwealth v. Luckett*, 2021 WL 3088758, at *5 n.9 (Pa. Super. July 22, 2021) (unpublished memorandum)).

This reading has the advantage that it avoids any internal tension whereby a motion may be made "at any time," 42 Pa.C.S. § 9543.1(a)(1), but testing should only be ordered if the motion was made "in a timely manner," *id*. § 9543(d)(1)(iii).  It is also consistent with the co-sponsorship memoranda issued by Senator Stewart Greenleaf and Representative Tedd Nesbit when they introduced the 2018 legislation.  Those memos reflect that the changes were intended to, *inter alia*, open up DNA testing to convicted individuals who are no longer incarcerated.  The memos do not say anything about eliminating the timeliness prerequisite for relief.  *See* General Assembly Regular Session 2015-2016, Senate Bill 1134, Memo.[31]

That is not the only way to understand the language.  In both instances where Section 9543.1 uses the phrase, "in a timely manner," which the statute does not define, those four words are followed by:  "and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." This longer formulation controls both when an applicant may seek DNA testing, *see id*. § 9543.1(a)(4), and when the court may order it, *see id*. § 9543.1(d)(1)(iii).  It is thus possible to view the phrase "in a timely manner" as being fleshed out and given specific meaning by requiring that the *purpose* for which testing is sought must be legitimate, namely, to demonstrate the applicant's actual innocence and not for delay.  This reading would be the same as, "in a timely manner, *in other words*, for the purpose of

---

[31]      The Greenleaf memo is available at: https://www.legis.state.pa.us/cfdocs/Legis/CSM/showMemoPublic.cfm (accessed May ___ 2025).       The Nesbitt memo is at: https://www.legis.state.pa.us/cfdocs/Legis/CSM/showMemoPublic.cfm (accessed May ___ 2025).

demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."

Under the first option, the phrase "at any time," which facially relates to timing, instead addresses the class of individuals to whom the benefits of the statute extend. It expands that class to include individuals who are not incarcerated. It also leaves unresolved the tension within paragraph (a)(4), whereby testing may be sought "at any time if the motion is made in a timely manner[.]" In the second reading, the word "and," a conjunction indicating two things must be true at the same time, is converted to mean "in other words." On top of this, "timely manner," which facially refers to the *timing* of the motion, is converted to relate solely to the applicant's *purpose* for filing the motion.

In light of the above, the statute does not lend itself to a plain-text analysis. This in turn suggests we should look to the rules of statutory construction for guidance.[32] Those rules state our primary object is to ascertain and effectuate the intention of the General Assembly, bearing in mind that effect should be given, if possible, to all of the statute's provisions, *i.e.*, no part of it should be considered surplusage. *See* 1 Pa.C.S. § 1921(a); *see also id*. § 1922(2) (reflecting that the Legislature "intends the entire statute to be effective and certain"). When resolving any lack of clarity we may consider, among other things, the occasion and necessity for the statute, the mischief to be remedied, the object to be attained, the former law on the same subject, the contemporaneous legislative history, and the consequences of a particular interpretation. *See id*. § 1921(c). Because Section 9543.1 is remedial legislation, it should be liberally construed to effect

---

[32] Statutory construction is appropriate here regardless of whether these interpretations may be described as "reasonable" so as to give rise to an ambiguity. *See* 1 Pa.C.S. §1921(c) (authorizing consideration of various factors when the words of the statute are "not explicit"). The non-explicit predicate for statutory construction, while ordinarily invoked for ambiguous language, also applies where any reading of the legislative text "raises non-trivial interpretive difficulties." *McGrath v. Bureau of Prof'l & Occupational Affairs*, 173 A.3d 656, 662 n.8 (Pa. 2017).

its objects and promote justice. *See* 1 Pa.C.S. § 1928(c); *accord In re Payne*, 129 A.3d 546, 554 (Pa. Super. 2015) (*en banc*). This does not mean, however, that it is subject to the most liberal construction conceivable. Nothing in our principles of statutory construction suggests as much, or that we must ignore the "societal interests in finality . . . and conservation of scarce judicial resources" when interpreting remedial statutory avenues for post-conviction relief. *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013).

The longer phrase – "in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice" – contains three requirements: (1) the motion must be made in a timely manner (not otherwise defined), *and* (2) it must have been made for the purpose of demonstrating the applicant's actual innocence, *and* (3) it must not have been made to delay the execution of sentence or administration of justice.[33] If this mandate were read as doing nothing more than giving meaning to the requirement that the motion must be filed "in a timely manner," it is unclear why the "timely manner" phraseology was included in the statutory text. The Legislature could simply have said that DNA testing may be sought, and testing should be ordered, so long as the motion is made to demonstrate actual innocence and not for delay. There would be no need to use the phrase, "in a timely manner," in paragraphs (a)(4) and (d)(1)(iii). As a consequence, that interpretation would render the phrase "in a timely manner" surplusage. But the first option gives rise to a

---

[33] While (2) and (3) may in some cases be two sides of the same coin, they are listed as distinct requirements. The latter states testing may not be sought for delay purposes, while the former implies the applicant must not have any ulterior motive other than to prove innocence. While one such ulterior motive could be delay, the Legislature evidently sought to preclude others as well. For example, a convicted person might seek testing primarily to gain attention, to force others to spend time and money on his behalf, or to prove he is not the only guilty party, *e.g.*, if he had a confederate who remains at large. These are just examples that come to mind, and others are possible. The point is the Legislature evidently sought to exclude any motives other than to prove actual innocence.

similar problem. If "timely manner" means what it says, the appearance of "at any time" in paragraphs (a)(1) and (a)(4) has no effect.

We should therefore consider the former statute, the mischief to be remedied, and the object to be attained, which in the present context are all interrelated since we are primarily considering the inclusion of "at any time" in paragraph (a)(1) as effectuated by the 2018 amendments. As previously discussed, the phrase "at any time" was inserted simultaneously with the deletion of a limitation whereby only incarcerated individuals were permitted to apply for DNA testing, and the sponsoring Senator's explanatory memorandum highlighted this expansion without saying anything about timeliness. It seems reasonable, then, to view these two changes to (a)(1) as a single unit, where the intent was to give persons whose prison sentence has expired an avenue to clear their names.[34] If that classification-expanding meaning for "at any time" in paragraph (a)(1) is adopted, it is reasonable to impute the same meaning to the same phrase as it appears in paragraph (a)(4) – a paragraph added at the same time as the changes were made to (a)(1).

I acknowledge this reading does not fit perfectly with the temporal-sense meaning of the phrase "at any time," when that phrase is considered in a vacuum. It nonetheless has a logical connection to the classification-expanding purpose of the amendments. A person who wishes to benefit from post-conviction DNA testing, and who is not incarcerated, may have spent *some time* in prison, and now at a *later time* is living in the community. It is not illogical therefore to refer to these two circumstances (life in prison

---

[34] Clearing one's name can have multiple practical benefits to the individual, such as being removed from a sex-offender registry, no longer forfeiting a pension, or expanding employment opportunities, to name a few. The removal of the imprisonment prerequisite also appears to give innocent persons serving intermediate punishment or those on parole or probation the ability to free themselves from supervision. It could lead, as well, to the negation of monetary consequences such as fines, restitution, and fees.

and life in the community) as occurring at different times and to specify that the individual may apply for testing "at any time," even if more precise wording could have been chosen by the legislative body.

By contrast, I see no way around the fact that reading "in a timely manner" to mean "for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice," not only renders the phrase "in a timely manner" superfluous, it also converts the word "and" into "in other words." And this latter reading suffers from the same alteration in meaning of an otherwise temporal phrase because, as noted, it converts the term "in a timely manner" into an expression addressing the *purpose* of the motion, not its timing. Additionally, if "in a timely manner" really means, essentially, "for a legitimate purpose," then it always meant that, including in 2002 when the Legislature first used the phrase in delimiting when relief could be provided. *See* 42 Pa.C.S. § 9543(d)(1)(iii) (2002). That, in turn, would mean there was never a timeliness requirement, and so the 2018 enactment's insertion of the phrase "at any time" into (a)(1) had no substantive effect – contrary to what this Court is required to presume. *See* 1 Pa.C.S. §§ 1921(a), 1922(2) (both directing a presumption the General Assembly does not purposely include superfluous language in its enactments).

Finally, even if "at any time" is construed in the most literal way possible, that phrase only appears in subsection (a) – which governs when the motion may be made. *See* 42 Pa.C.S. § 9543.1(a)(1), (4). It does not appear in any aspect of Section 9543.1 that relates to when relief on the motion is available. The response of the DNA court is addressed in subsection (d), which allows for relief only if the motion is made "in a timely manner." *Id*. § 9543.1(d)(1)(iii). As explained, *that* timely-manner prerequisite was in the 2002 act and was not removed by the 2018 amendments. Indeed, the General Assembly elected to retain it after it had been interpreted by the Superior Court, and by this Court,

to preclude relief where the motion was not timely. *See Edmiston*, 65 A.3d at 357 (expressing that Edmiston's motion was "untimely as a matter of law *and* was forwarded only to delay further the execution of the sentence" (emphasis added)); *Commonwealth v. Walsh*, 125 A.3d 1248, 1258 (Pa. Super. 2015) (holding that relief was unavailable on a DNA testing motion because it was untimely). This, in turn, is powerful evidence that the General Assembly did not intend to either do away with a timeliness requirement or clarify that the statute never included one. *See Verizon Pa., Inc. v. Commonwealth*, 127 A.3d 745, 757 (Pa. 2015) ("One of the most venerable and fundamental tenets of statutory interpretation is that, whenever our Court has interpreted the language of a statute, and the General Assembly subsequently amends or reenacts that statute without changing that language, it must be presumed that the General Assembly intends that our Court's interpretation become part of the subsequent legislative enactment"). *See generally* 1 Pa.C.S. § 1922(4) (directing a presumption that when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject intends the same construction to be placed upon such language).

As for the consequences of a particular interpretation, under my reading timeliness is an independent predicate that subsists alongside the requirement that the motion be made to prove innocence and not for delay. As a result, relief would be unavailable to someone who unduly delays filing a motion even though the motion is filed for all the right reasons. This has some drawbacks. The downside is reflected in the commonsense notion that if the applicant really is innocent, it should not matter when he seeks to prove it: if he succeeds, he will be freed from the consequences of an erroneous guilty verdict, and the taxpayers will no longer have to pay for his continued incarceration or supervision.

With that said, it is not unreasonable for the Legislature to seek to prevent undue delay in this context. If a new trial is necessitated, an unreasonable delay could mean

memories have faded, witnesses have died or disappeared, and evidence has been lost.[35]  These considerations are well known in relation to laws that likewise seek to avoid undue delay, such as statutes of limitation.  *See Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945).  Such factors could, in turn, prejudice the Commonwealth's ability to obtain a reliable determination of guilt or innocence at a new trial.  *Cf*. 42 Pa.C.S. § 9543(b) (directing that a PCRA petition should be dismissed even if all requirements are met, including timing requirements, if it appears that the petitioner's delay in filing it has prejudiced the Commonwealth in its ability to respond or to re-try the petitioner).  *See generally Herrera v. Collins*, 506 U.S. 390, 417 (1993) (highlighting the "enormous burden that having to retry cases based on often stale evidence would place on the States").[36]

In all events, even if some would consider it wiser policy not to require timeliness, the inclusion of a timeliness prerequisite is not the type of result that weighs heavily against my interpretation, as it would if the outcome were absurd, impossible of execution, or unreasonable, which it is not.  *See* 1 Pa.C.S. § 1922(1) (reflecting a presumption the General Assembly does not intend such a result).  Nor can it outweigh the serious interpretive problems attendant to a construction that reads "in a timely manner" out of

---

[35] A DNA-testing applicant is only entitled to testing if he sets forth a *prima facie* case that the testing, assuming exculpatory results, would establish his actual innocence.  *See* 42 Pa.C.S. § 9543.1(C)(3).  The actual results obtained may be insufficient to justify discharge.  If those results become the after-discovered facts for a new PCRA petition, the PCRA court may instead determine retrial is the appropriate relief.  *See id*. § 9546(a) (authorizing the PCRA court to order "appropriate relief" including retrial); *Commonwealth v. Scarborough*, 64 A.3d 602, 610 (Pa. 2013).  When drafting Section 9543.1's timeliness prerequisite, the Legislature is assumed to have been aware of the content of Section 9546(a), and thus to have considered the possibility of retrial.

[36] Although any subsequent PCRA petition could potentially be dismissed due to prejudice from delay, *see id*.; *Commonwealth v. Markowitz*, 32 A.3d 706 (Pa. Super. 2011); *Commonwealth v. Weatherill*, 24 A.3d 435 (Pa. Super. 2011), that can only happen if the prejudice results from the delay in filing the PCRA petition itself.  It is not evident that an unwarranted delay in seeking DNA testing so as to generate after-discovered facts would likewise allow the Commonwealth to seek dismissal on those grounds.

the statute entirely or converts it into a requirement concerning the appropriate motivation for the DNA applicant. Finally, none of this speaks to what actually constitutes timeliness under the statute, a topic discussed below. My only conclusion thus far is that Section 9543.1 indicates the motion's timeliness is a requirement that must be satisfied as a predicate to relief.

### 3. The meaning of "timely manner" in this context

When the General Assembly tells the judicial branch what timely means, such as with the one-year rule for PCRA petitions, *see* 42 Pa.C.S. § 9545(b)(1), there is no need to assess any of the practical circumstances impacting upon the timing of the litigant's filing: either it was within the deadline or it was not. *See Commonwealth v. Bradley*, 261 A.3d 381, 390 (Pa. 2021) (noting this Court has interpreted the one-year filing requirement as a jurisdictional limitation). But here, the Legislature has not given a hard deadline of so many months or years, nor has it otherwise clarified what "timely manner" means. This suggests a reviewing court's evaluation of timeliness must look at practicalities. Timeliness relates to when, practically speaking, a motion for the presently-sought DNA testing could realistically have been made, and it suggests the motion must be made within a reasonable period thereafter.

Such an assessment will depend in each case on multiple factors. What type of DNA testing is being requested, and how long prior to the motion was that kind of testing reasonably available? Is the DNA testing now being requested materially better than previous methods, in the sense that prior methods could not have revealed some of the relevant information the current request seeks to discover? Even if the methodology previously existed and was widely used, has there been a substantial change in the information contained in DNA databases that might reasonably produce relevant "hits" now which would not have been produced before? Did the statute previously allow that

kind of DNA testing to be sought, and if not, when was the effective date of the legislative amendment that allowed it?  Is it true that the applicant could not realistically have known of the advances in the science presently relied upon because he was in prison and unrepresented during the delay period?[37]

This is not meant to be an exhaustive list.  DNA courts could consider any change in circumstances that supports the concept the petitioner did not unduly delay making the motion after the point in time that he could realistically have made it.[38]  Undertaking this type of assessment would advance the remedial objectives of the legislation while also giving meaning to its timeliness prerequisite.  If the applicant was represented, had knowledge of the DNA testing currently sought, and did not file a motion for many years

_____

[37] I note in this regard that the public record presumption no longer applies to PCRA petitions filed pursuant to the newly-discovered-facts exception to the PCRA's one-year time bar.  *See Commonwealth v. Small*, 238 A.3d 1267, 1286 (Pa. 2020).  *Small* disapproved the judicial insertion of words into the timeliness prerequisite for PCRA petitions, particularly where doing so was in tension with the PCRA's plain language.  *See id*. at 1285.

Even before that, we abolished the presumption as to *pro se* PCRA litigants, recognizing such persons have a limited capability to keep abreast of developments in the law and the outside world while incarcerated.  *See Commonwealth v. Burton*, 158 A.3d 618, 636-37 (Pa. 2017).  The same reasoning applies here, as there is no indication in the statutory text that courts should impute to incarcerated DNA applicants knowledge of facts in the outside world on the date those facts enter the public domain.

[38] The Commonwealth argues a motion should be deemed untimely where the presently-sought DNA testing could have been accomplished at the time of trial.  It reasons that granting relief relative to items that could have been analyzed would open the door to strategic decisions by trial counsel to forego testing in hopes of an acquittal and then seek it only if the defendant is convicted.  *See* Brief for Commonwealth at 31-32, 42 (citing *Commonwealth v. Williams*, 899 A.2d 1060, 1065 n.4 (Pa. 2006)).  While the Commonwealth looks to engraft that concept onto the timeliness requirement, the statute already precludes such gamesmanship by making the trial-time unavailability of the presently-sought DNA testing an independent precondition to relief, subject to certain exceptions not presently relevant.  *See* 42 Pa.C.S. § 9543.1(a)(2); *Williams*, 899 A.2d at 1063 (concluding paragraph (a)(2) precludes relief as to evidence discovered prior to conviction where the DNA technology existed at the time of trial, the verdict was reached after January 1, 1995, and the court never refused funds for the testing).

after he reasonably could have, the motion would not have been made in a timely manner so as to implicate a merits evaluation of the request.

## B. Application to this case

The analysis above seeks to understand what the legislative body had in mind when it set forth the threshold requirements for a DNA testing motion. I now address how those prerequisites should apply to the present dispute.

### 1. The not-for-delay requirement

As explained, DNA testing may be sought and ordered only if the motion is made in a timely manner, to prove actual innocence, and not for delay purposes, and these are three separate requirements. With that said, the not-for-delay mandate does not apply here. Appellant is serving a sentence of life without parole. Nobody in that situation could gain anything from delay. We may presume Appellant would rather be released than incarcerated; thus, there is nothing to delay except Appellant's potential exoneration. That being the case, I conclude as a matter of law that Appellant could not have filed his motion for DNA testing for reasons of delay. The question becomes, then, whether Appellant's motion was made in a timely manner and to prove his actual innocence.

### 2. The to-prove-innocence requirement

Before considering whether the motion was made in a timely manner, I address whether the mandate that testing is sought to prove innocence applies and, if so, whether it is satisfied. I believe the requirement applies here because, unlike with the not-for-delay requirement, it is possible for someone serving life without parole to have an ulterior motive other than to demonstrate actual innocence. Generally speaking, the DNA applicant has the burden to satisfy all of the threshold requirements for testing. However, to show a motive other than to establish actual innocence is to prove a negative, which is notoriously difficult when it requires demonstrating the absence of a disfavored mental

state.[39] Bearing in mind the remedial purpose of the statute, as a precondition to testing the applicant must affirm in a sworn statement subject to the penalties of perjury that he is proceeding "for the purpose of demonstrating the applicant's actual innocence." 42 Pa.C.S. § 9543.1(c)(2)(i). The record here reflects that on June 26, 2020, Appellant filed a statement in compliance with paragraph (c)(2)(i), *see* RR. 57a, which satisfied his initial obligation in that respect. This, in turn, shifted the burden to the Commonwealth to submit any proofs it possessed tending to show Appellant was motivated by some other purpose and not by a genuine effort to establish his actual innocence. *See Vanormer v. Hornberger*, 21 A. 887, 888 (Pa. 1891) (observing that when a litigant is tasked with proving a negative, "slight evidence will throw the onus upon" the opposing party). The record in its current state does not contain any such evidence, a circumstance I discuss *infra*.

### 3. The timeliness requirement

The more difficult question in applying the language of paragraphs (a)(4) and (d)(1)(iii) to the present case is whether the motion was timely. Instantly, the DNA court held that the motion was untimely, proceeding mainly by comparison with the situation in *Edmiston*. Using several metrics, such as the delay between the 2002 passage of the statute (or the underlying conviction) and the filing of the motion, and the number of years Appellant had known about the evidence in question, the DNA court developed that the present motion was even more tardy than the one in *Edmiston*. Because this Court

---

[39] *See, e.g.*, *Beaver Gasoline Co. v. Zoning Hearing Bd. of Borough of Osborne*, 285 A.2d 501, 504 (Pa. 1971); *Murray v. Commonwealth*, 79 Pa. 311, 315 (Pa. 1875); *cf. Morrow v. Waltz*, 18 Pa. (6 Harris) 118, 120 (1851) ("It is a general rule of evidence that a party is not to be called on to prove a negative[.]").

Even accepting *arguendo* the Commonwealth's description that the present motion constitutes a "Hail Mary" pass in light of the inculpatory evidence adduced at trial, that alone does not suggest a motive unrelated to proving actual innocence.

determined that the defendant in that matter failed to submit a timely motion, the DNA court in the present dispute reasoned that, *a fortiori*, Appellant was also precluded from relief on the same basis. See *Hardy*, No. 1647 of 1993, *slip op*. at 15-17.

The problem with this reasoning is that we rejected Edmiston's application for DNA testing based primarily on the realization that he was seeking only to delay execution of his sentence, an incentive that does not exist here. Therefore, in that matter we did not have to analyze and apply a timeliness requirement that was conceptually distinct from any concerns over motivation. We did allude to the substantial amount of time that had elapsed, for example, from Edmiston's trial and his awareness of the evidence in question to the date of his motion, as well as his failure to ask for testing within a reasonable period after certain advances in DNA technology arose. *See Edmiston*, 65 A.3d at 357-58. But in context, we adverted to such factors as suggesting that the real purpose for the belated DNA request was to delay the inevitable.

The evidence in that case included Edmiston's own confession, his having drawn a map for the police to use in locating the body in a remote area, and the finding of the body by the police exactly where Edmiston said it would be. As well, Edmiston indicated at trial he was satisfied with the DNA testing that was done at that time, and he was represented by counsel continuously from that juncture until many years later when he submitted his DNA motion. Under those circumstances this Court concluded that, had Edmiston requested testing pretrial it would only have confirmed his guilt, and hence, with his current request Edmiston was only seeking to delay the execution of his sentence rather than attempting in good faith to prove innocence. *See id*. at 358 (explaining that pretrial DNA testing would likely have "sealed Appellant's fate," which in turn was "probative of the delay and purpose of Appellant's belated request for DNA testing"). Thus, while the delayed filing of Edmiston's motion, combined with the other factors

summarized above, convinced us his motion was not made "in a timely manner and for the purpose of demonstrating [his] actual innocence," *id*. at 358-59, the latter half of that formulation was the primary substantive basis for our decision. *See id*. at 358 (concluding, based on the full record, that Edmiston was "not a likely candidate to be exonerated by DNA testing").

*Edmiston*'s rationale does not apply forcefully to this case because, as noted, it was in substance directed to the defendant's motivation for filing his motion for DNA testing and not, centrally, to whether Edmiston waited too long under the statute. As a consequence, this is the first appeal in which we have had to address the way in which DNA courts should apply Section 9543.1's timeliness prerequisite. That is because, as explained, the not-for-delay mandate does not logically pertain where the defendant is serving a life sentence. This leaves only the question of whether the motion in the present litigation was made in a timely manner as set forth above.

In answering that question, I note first that the timeliness question pertains differently to the evidentiary items that were not previously tested and those that were. The statute did not allow retesting of previously-tested items until 2018. The text added at that time is shown in bold below:

> (2) . . . If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, **or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results,** or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency..

42 Pa.C.S. § 9543.1(a)(2) (2018). The above amendment, which went into effect in late December 2018, for the first time allowed retesting of previously-tested evidence.

Appellant filed his motion 18 or 19 months thereafter. As such a delay is relatively small, I would conclude the motion was timely as a matter of law concerning the evidence that underwent DNA testing at the time of Appellant's trial.

Evaluating the timeliness of the motion as it pertains to evidence that was not previously tested is not as straightforward. The difficulty with trying to determine from an appellate posture whether the circumstances in this matter support a finding of timeliness as to those items is that there is no evidentiary record from which to draw the necessary information. Appellant's motion asserts the Pennsylvania State Police began use of STR testing in 2000, a full two decades before he filed his motion. *See* Motion ¶96, *reprinted in* RR. 39a. And where he seeks to draw support for the position that such testing is qualitatively better than earlier technology, particularly with trace amounts of DNA and degraded DNA samples, he references technical papers published in 1998 and 2012, a federal Department of Justice publication from 2002, and a 2002 federal appellate decision.[40] That Appellant filed his motion so many years later suggests he may have waited an unreasonable amount of time. With that said, Appellant did attach to one of his filings in the DNA court an affidavit from an expert, the contents of which discuss more recent technological advances, such as the emergence of probabilistic genotyping alleged to have occurred in 2014, and significant qualitative improvements made by the FBI in 2017 to the CODIS database, *see supra* note 24 – all of which are alleged to have enhanced the ability to ascertain the perpetrator's identity from the biological samples left

---

[40] *See id*. ¶101, *reprinted in* RR. 40a-41a (citing John M. Butler, *The Use of Capillary Electrophoresis in Genotyping STR Loci*, 98 METHODS IN MOLECULAR BIOLOGY 317-19 (1998)); *id*. ¶103, *reprinted in* RR. 41a (citing Angela L. Williamson, *Touch DNA: Forensic Collection & Application to Investigations*, J. ASSOC. CRIME SCENE RECONST. 2012:18, 1-5); *id*. ¶104, *reprinted in* RR 41a (citing U.S. DEP'T OF JUSTICE, OFC. OF JUSTICE PROGRAMS, NAT'L INST. JUSTICE, *Using DNA to Solve Cold Cases*, Pub. No. 194197 (July 2002)); *id*. ¶98, *reprinted in* RR. 39a-40a (citing *Harvey v. Horan*, 285 F.3d 298, 305 n.1 (4th Cir. 2002) (Luttig, J., concurring in denial of rehearing *en banc*)).

at the crime scene. This information suggests only three years may have elapsed between when the relevant technology became available and the filing of the motion.

Additionally, on this record, factors that might suggest Appellant acted with due diligence based on what he could reasonably have known while incarcerated should not be ruled out. Appellant asserts he was unrepresented between 2001 when his PCRA litigation concluded and 2020, *see* Brief for Appellant at 31, and the record does not disclose what knowledge he acquired or what practical limitations might have prevented him from becoming informed on the topic and filing a motion sooner. *See id*. at 44 (arguing such lack of representation hindered Appellant's ability to "navigate the legal and scientific complexities of deciding whether and when to seek post-conviction DNA testing"). Nor does the record reflect whether the most recent technological improvements mentioned in the filings – probabilistic genotyping and the 2017 CODIS upgrades – are, in fact, needed for the information Appellant hopes to obtain.

These types of deficiencies would ordinarily inure to the detriment of the moving party who seeks to upset the status quo, as that party bears the initial burden to fulfill the prerequisites to relief and make an evidentiary record to support his request. *See 500 James Hance Court v. Pa. Prevailing Wage Appeals Bd.*, 33 A.3d 555, 575-76 & n.28 (Pa. 2011) (quoting *Henes v. McGovern*, 176 A. 503, 506 (Pa. 1935)). In this case, that is Appellant. However, before today neither party had the benefit of an explanation by this Court of whether timeliness really is required, and if so, the standard by which DNA courts are to assess it. The disposition I favor would be the equivalent of setting forth a new standard – and in such situations we have determined a remand is the appropriate course of action. *See Phoenixville Hosp. v. WCAB (Shoap)*, 81 A.3d 830, 846 (Pa. 2013) ("Remand is an appropriate remedy when a court announces a new standard to be applied to the facts of a case.") (citing *Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1039 (Pa.

1980); *Cuevas v. Platers & Coaters, Inc.*, 346 A.2d 6, 9 (Pa. 1975); *Querry v. Pa. Glass Sand Corp.*, 354 A.2d 600, 603-04 (Pa. Cmwlth. 1976)). Therefore, if Appellant was otherwise entitled to relief, I would remand for further proceedings in view of the standard set forth above. The remand would allow the parties to put forth any evidence impacting upon timeliness, and it would also give the Commonwealth a chance to adduce proofs, tending to show Appellant's motivation for filing the present motion if it has any.

## IV. Evidence eligible for DNA testing

### A. Statutory requirements

Paragraph (a)(2) sets forth the categories of evidence for which post-conviction DNA testing may be sought, including evidence discovered before the applicant's conviction and evidence discovered after it. *See* 42 Pa.C.S. § 9543.1(a)(2). There is no dispute that all the evidence for which Appellant currently seeks testing was discovered before his conviction. To be eligible for testing, such evidence

> shall not have been subject to the DNA testing requested because [(i)] the technology for testing was not in existence at the time of the trial or [(ii)] the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or [(iii)] the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results, or [(iv)] the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

*Id*.[41] This disjunctive list gives four ways evidence that was known about at trial may now be eligible for "the DNA testing requested." Here, the verdict was reached after January 1, 1995, and Appellant does not contend any evidence was untested at the time of trial

---

[41] Taken at face value, one aspect of this paragraph appears self-contradictory: "the evidence shall not have been subject to the DNA testing requested because . . . the evidence was subject to the testing . . .." While the drafting perhaps leaves something to be desired, the intent seems clear: to set forth a newer-technology prerequisite for evidence that was previously subject to the DNA testing requested in the motion.

due to a refusal of funds.  This means eligibility options (ii) and (iv) are not applicable. We are only concerned with eligibility options (i) and (iii).  The former applies to evidence that was not previously tested, while the latter applies to previously-tested items.

*1. Eligibility option (i) – evidence that was not previously tested*

Evidence qualifies under option (i) if "the technology for testing" did not exist at the time of trial.  That phrase signifies either that the technology for *any DNA testing* (however rudimentary) did not exist at the time of trial, or that the technology for *the currently-sought DNA testing* did not exist at that time.[42]  Both meanings are plausible.  The General Assembly could have reasoned that if DNA testing, however primitive, was available and the applicant chose not to have the evidence tested, he did so for strategic reasons and cannot now second-guess his earlier choice.  Or the legislature could have reasoned that the DNA testing currently sought is precluded only where that same type of DNA testing was available at trial and the applicant chose to forego it.  This also would be aimed at curtailing gamesmanship by the defense, but it would render fewer items of evidence ineligible for testing at the present time.  Hence, the statute is ambiguous.  *See generally PIAA v. Campbell*, 310 A.3d 271, 180 (Pa. 2024) (noting a statute is ambiguous when there are two reasonable interpretations of its provisions) (citing *JP Morgan Chase Bank N.A. v. Taggart*, 203 A.3d 187, 194 (Pa. 2019)).

As previously discussed, the legislation is remedial and therefore subject to a liberal interpretation, which weighs in favor of the second meaning.  We may also presume the Legislature was aware it is in the nature of DNA technology to improve over time, including in its ability to obtain testable DNA from degraded samples, as well as its

---

[42] Although "testing" is not delimited by a modifier, statutory words are not interpreted in isolation but with reference to the context in which they appear.  *See Roethlein v. Portnoff Law Assocs.*, 81 A.3d 816, 822 (Pa. 2013).  Because the context here is DNA testing, it would make little sense to read the word "testing" as it appears in paragraph 9543.1(a)(2) to encompass other types of testing.

ability to extract DNA from physical items from which DNA could not previously be obtained.[43]  It seems to us that the Legislature intended that if these types of advances occurred after trial, previously-untested evidence can become eligible for testing.  This conclusion is consistent, as well, with the understanding of Senator Greenleaf, who sponsored the 2002 bill and the 2018 bill.[44]

Accordingly, I conclude that under eligibility option (i), previously-untested evidence may be eligible for the currently-sought DNA testing where the technology for such testing did not exist at the time of trial.

*2. Eligibility option (iii) – previously-tested evidence*

Alternatively, under option (iii), previously-tested evidence is eligible for another round of testing only if newer technology could provide "substantially more accurate and substantially probative results."  42 Pa.C.S. § 9543.1(a)(2).  Indeed, that is the primary significance of the explanation contained in the co-sponsorship memos of Senator Greenleaf and Representative Nesbit*.  See supra* note 44.

---

[43] For example, *amicus* The Innocence Project describes that porous materials such as fabric or rubber tend to absorb DNA, making it unavailable for extraction from the surface, but recently-developed techniques such as wet-vacuum technology are capable of obtaining DNA samples even from these materials.  *See* Brief at 19 (citing Jessica M. McLamb et al., *Comparison of the M-Vac Wet-Vacuum-Based Collection Method to a Wet-Swabbing Method for DNA Recovery on Diluted Bloodstained Substrates*, 65 J. FORENSIC SCI. 1828, 1832 (2020)).

[44] In his co-sponsorship memo in 2018, Senator Greenleaf explained that one of the act's objectives was to "[a]llow testing when new DNA testing technology becomes available.  *Currently, DNA testing is only available when the testing technology being requested was not available at the time of trial.*  . . .  [M]any testing laboratories reach 'inconclusive' results when there are multiple persons' DNA in a sample, but newer technologies exist to separately identify the DNA of multiple persons."  Stewart Greenleaf co-sponsorship memo at 1.  The same sentiments were expressed by sponsoring House member, Representative Nesbit, in his co-sponsorship memo.  The emphasized sentence above reflects the sponsors' understanding that even prior to the 2018 amendments evidence was eligible for DNA testing so long as the currently-requested testing technology was unavailable at trial time.

With that said, the specification that the new testing must be able to produce "substantially probative results" is not entirely clear. Do the results have to be substantially probative in isolation, or in conjunction with the (as yet unknown) results from other previously-tested items – or is it enough if they could be substantially probative only when considered in conjunction with the results of the prospective testing on all other evidence including previously-*un*tested items? The present case brings that question to the surface because Appellant's redundancy theory depends on an alignment between the DNA results from multiple pieces of evidence, including previously-tested items and previously-untested items. *See supra* note 25.

My answer is informed by the enactment's post-testing procedure. As developed above, DNA testing under Section 9543.1 is designed as a predicate to a new PCRA petition based on the after-discovered-facts exception to the one-year time bar. *See supra* note 19 & related text. Section 9543.1 indicates that if the new evidence is indeed exculpatory, the PCRA court must then "determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi)." 42 Pa.C.S. § 9543.1(f)(3).[45] Such an inquiry invokes a hypothetical jury that would have had all of the new evidence before it, and it focuses on the outcome of the trial that would have taken place. This necessarily entails a collective assessment of all of the new evidence because that would be the foundation for the hypothetical jury's ultimate verdict. *See Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004) (explaining the PCRA court must assess the significance of after-discovered evidence in light of the trial record "as a whole"); *accord*

_____

[45] *See id*. § 9543(a)(2)(vi) (allowing relief under the PCRA based on after-discovered exculpatory evidence that "would have changed the outcome of the trial if it had been introduced"). By contrast, if the testing conclusively identifies the applicant's DNA profile on probative inculpatory evidence, the DNA court must dismiss the petition. *See id*. § 9543.1(d)(6).

*In re Brown*, 810 S.E.2d 444, 459 (Va. 2018). Hence, it seems unlikely the "substantially probative" prerequisite to eligibility for the testing of previously-tested items was intended by the Legislature to be determined in isolation for each individual piece of evidence without considering all of the other evidence in the case – including the results of the new DNA testing on all items that are eligible for such testing at the present time.

**B. Application to this case**

*1. Introduction – prior unavailability of the DNA testing requested*

One common feature of the standard for eligibility, as regards previously-untested and previously-tested evidence, is that the currently-requested DNA testing must not have existed at the time of trial. In his motion, Appellant asserted that this was true. He referred to the "rudimentary state of DNA testing technology" in 1996, and he sought testing using "modern DNA testing techniques" that, he maintained, could prove his actual innocence when used on the biological evidence left at the crime scene and on the victim's body. Motion at ¶¶ 3-4, *reprinted in* RR. 17a; *see also id*. at ¶¶ 92-107, *reprinted in* RR. 37a-42a (elaborating on these technological improvements). In its answer, the Commonwealth did not deny these allegations.

Further, Appellant attached to his filings a detailed affidavit from DNA testing expert Alan Keel, who attested that he is certified by the American Board of Criminalistics in molecular biology and has been performing DNA-analysis casework since 1991. *See* Keel Affidavit at ¶ 3, *reprinted in* RR. 324a. His affidavit outlined the substantial advances in DNA testing that have occurred since the mid-1990s, and it emphasized his view that the testing in use at that time consisted of techniques that required a large sample of DNA and are now obsolete as they have been replaced by more sophisticated methods for which smaller and degraded samples are adequate. *See* Keel Affidavit at ¶ 7 & n.1, *reprinted in* RR. 326a. According to the affidavit, the testing used in 1993 involved RFLP

(restriction fragment length polymorphism) which needed 50 to 200 times as much DNA as the modern methods that can make identifications from severely degraded DNA samples predicated on short-tandem repeats (STR). *See id*. *See generally* BELL & BUTLER, *supra* note 24, at Chapter 4 (relating to STR Methods and Loci). Keel alleged that today's STR technology is "exponentially more sensitive and discriminating than the early-generation DNA analysis methods" available in 1996, and it became the foundation for the FBI's CODIS database in 2000. *Id*. at ¶ 8, *reprinted in* RR. 326a.

Mr. Keel additionally highlighted post-1996 advances such as: touch DNA recoverable from clothing, wire, twine, and zip-ties used as opportunistic ligatures, as well as random objects left at crime scenes by perpetrators, which can be sufficient to create a profile; Y-STR testing which can pick out male DNA intermixed with female DNA such as might be found under a female victim's fingernails or on her clothing after being attacked by a male assailant; mini-STR testing for small or severely degraded biological samples, particularly from old cases; computer-assisted probabilistic genotyping that can assign a probability that a particular suspect contributed to a multi-donor DNA mixture, as might occur on a weapon handled by many individuals or clothing touched by several persons; and two modifications to the CODIS system – its growth to include 20 core STR genes, and the expansion of the types of profiles that can be searched against it – which together have created the potential to produce leads from virtually any biological sample recovered from physical evidence. *See id*. at ¶¶ 9-15, *reprinted in* RR. 326a-328a.

The Commonwealth did not dispute that significant DNA advances occurred in the post-trial timeframe, but neither did it stipulate to the accuracy of the specific averments contained in the Keel affidavit. The Keel affidavit, as explained, was not included with Appellant's motion, to which the Commonwealth had an opportunity under the statute to respond. It was attached to Appellant's reply to the Commonwealth's statutory response.

It is not clear from the statute that such filing was permissible. The majority nonetheless endorses Appellant's extra-statutory filing, and it goes further, suggesting the Commonwealth has elected not to dispute the allegations contained therein. *See* Majority Op. at 56 ("The Commonwealth did not dispute Hardy's identification of the relevant testing techniques, nor did it challenge the averments of the Keel affidavit.").

I respectfully find that to be a questionable conclusion. Any allegation in the affidavit offered for its truth is hearsay, *see* Pa.R.E. 801; *see also* Pa.R.E. 802 (making hearsay inadmissible except where a statute or this Court's rules make it admissible), and affidavits are known to be less reliable than live testimony because they are not subject to cross-examination. *See Commonwealth v. Hall*, 302 A.2d 342, 345-46 (Pa. 1973). Moreover, the parties did not have the benefit of an evidentiary hearing at which testimony could be offered, proofs concerning modern DNA techniques could be presented, and objections lodged and ruled upon.[46] Nobody doubts DNA technology has improved since the 1990s. But the majority, while not expressly taking judicial notice of facts outside the record, seems to short-circuit the traditional evidentiary process by relying on the absence of a further extra-statutory pleading on the part of the Commonwealth to suggest it has acquiesced to the specific averments contained in an affidavit.

The parties also did not have the benefit of this Court's present interpretation of the amended statute, under which the focus is on the testing currently being sought, and the eligibility of specific items of evidence for a fresh round of testing depends largely on the specific features of the new methodologies and how they compare to the technology in use at the time of trial. That being the case, and for the reasons previously outlined, if

---

[46] Although Section 9543.1 does not expressly direct the DNA court to hold a hearing prior to deciding whether to order testing, clearly the court cannot rule while genuine issues of fact material to its eventual ruling remain unresolved. *Cf.* Pa.R.Crim.P. 908 (requiring a hearing on a PCRA petition where there are material issues of fact).

Appellant is otherwise entitled to relief, I would remand for further proceedings in view of the standard set forth above. This would give both parties a chance to develop the evidentiary record through testimony concerning the allegations contained in Mr. Keel's affidavit, *cf. Commonwealth v. D'Amato*, 856 A.2d 806, 826 (Pa. 2004) (remanding for live testimony concerning a recantation statement, the credibility of which was in doubt), and to supplement the same with other evidence they deem probative, should they choose to do so.

*2. Previously-untested evidence in this case*

Appellant seeks DNA testing of a variety of items that were not previously subject to any DNA analysis. These include objects that Appellant posits may have been touched or handled by the perpetrator, including: the twine from around Deborah's neck; Deborah's clothing; finger and palm prints taken from her car; her car keys; her purse; various items from the purse; the octagonal accordion gate bolt found near Deborah's car; and the business card found near the vehicle. Appellant also argues only two small pieces of flesh from under Deborah's fingernails were previously tested, and hence, the overwhelming majority of her fingernail scrapings remain untested. He seeks testing of those scrapings.

The Commonwealth maintains such evidence is not presently eligible for testing, characterizing Appellant's request as strategic in nature. The Commonwealth proffers that these items were all known about at trial and Appellant could have asked that they be tested at that time. It adds that even in his PCRA petition filed several years after his trial, in which Appellant alleged counsel was ineffective in relation to his decision not to testify in his own defense, Appellant did not raise any issue concerning counsel's failure to seek DNA testing. *See* Brief for Commonwealth at 41-46 (citing, *inter alia*, *Commonwealth v. Williams*, 899 A.2d 1060, 1064 (Pa. 2006) (explaining counsel's failure

to pursue DNA testing could have been motivated by a reasonable strategy because the results might have been inculpatory)).

The Commonwealth's position would have merit if Appellant were seeking to employ the DNA technology that existed at the time of his trial. But this is in serious doubt in light of Appellant's averments concerning the existing state of DNA-testing technology as compared to when his trial occurred in 1996. Even if the Commonwealth is correct in suggesting Appellant had a strategic reason not to pursue DNA testing at the time of trial, that alone is not a basis for ineligibility under option (i), which only negates eligibility if the technology already existed at that time. *See* 42 Pa.C.S. § 9543.1(a)(2). It should be remembered that Section 9543.1 is not primarily aimed at dissuading strategic behavior, but at giving wrongly-convicted persons an avenue to prove their innocence. *See Commonwealth v. Conway*, 14 A.3d 101, 113 (Pa. Super. 2011). Hence, its limitations on eligibility should not be expanded beyond what the statutory text can support.[47]

### 3. Previously-tested evidence in this case

Appellant also requests re-testing of the several pieces of evidence that were subject to DNA testing before trial: semen from the victim's vaginal swab and underwear, semen and vaginal fluid from a condom found near her car, the blood found on her shirt, and flesh scrapings from under her fingernails. As none of these items implicated Appellant at trial, his theory is not that a new round of testing would merely confirm that result. Rather, he contends it could potentially generate proof of his innocence by implicating another person if that individual's DNA is located on each piece of evidence.

---

[47] Unlike with option (iii), eligibility under option (i) does not expressly depend on a showing that the results of the new DNA testing might be "substantially probative." That requirement will be implicit when one considers whether Appellant has set forth a *prima facie* case of actual innocence assuming exculpatory results.

Relative to these items, the newer technology must be capable of providing "substantially more accurate and substantially probative results." 42 Pa.C.S. § 9543.1(a)(2). This language includes an accuracy litmus and a probativeness litmus. As to the former, whether the testing can provide "substantially more accurate" results is a function of the possibilities opened up by the technology. With that said, whether such results, even if substantially more accurate, are "substantially probative" is an assessment that can be made now on the present record. I would conclude as to the bloodstain on Deborah's shirt and her fingernail scrapings that a fresh round of testing could yield substantially probative results. If indeed the killer was someone other than Appellant, it is certainly possible that his DNA could be located on these two items.

The semen samples from Deborah's underwear and from the vaginal swab are another matter. The DNA testing that was done in 1993 revealed that these samples were contributed by Kenneth Logan. As mentioned, no evidence of sexual assault was uncovered and the state of Deborah's clothing did not suggest any such assault had occurred. As a consequence, there is nothing in the record to support the position that semen from another male besides Logan would be probative of the identity of Deborah's killer. The same conclusion applies with regard to the condom found near Deborah's truck in an area frequented by prostitutes. There was no connection between the condom and Deborah's killing, and Appellant has not articulated any credible basis to believe further DNA testing of the condom might yield probative results. He does allege the semen from the condom matched the male donor in an unsolved rape case nearby. He therefore suggests new testing of the condom might link that case with this one because a condom-wearing serial rapist might have revisited the scene of his crimes. *See* Brief for Appellant at 50. But this is highly attenuated and it is based on a false premise because it assumes, contrary to the record, that Deborah was the victim of a rape-murder.

Accordingly, while the fingernail scrapings and shirt may be eligible for retesting under option (iii), I would clarify that the underwear, vaginal swab, and condom are not.

## V. Actual innocence assuming exculpatory results

The final hurdle to new DNA testing subsumed in the issues we accepted for review is the requirement that Appellant set forth a *prima facie* case demonstrating that the perpetrator's identity was at issue at trial, and demonstrating Appellant's actual innocence if exculpatory results are obtained. *See* 42 Pa.C.S. § 9543(c)(3). There is no dispute the perpetrator's identity was at issue, as it was clear Deborah was the victim of a homicide and the primary question for the jury was who did it. Thus, I turn now to whether Appellant has established a *prima facie* case of his "actual innocence" if "exculpatory results" are assumed. Before making that determination, it is helpful to inquire into the meaning of both of those phrases.

### A. Interpretation

#### 1. Prima facie case of actual innocence . . .

One of the few things the parties agree on in this appeal is the meaning of the term "actual innocence" as used in Section 9543.1. They both propose it means, in essence, that no reasonable jury would have convicted if it had known about the new DNA evidence. *See* Brief for Appellant at 55-56; Brief for Commonwealth at 46-47. They note the Superior Court in *Conway* applied this definition for Section 9543.1 purposes based on the Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995). *See Conway*, 14 A.3d at 109 (referring to a reviewing court's "probabilistic determination about what reasonable, properly instructed jurors would do" in the face of the new evidence) (quoting *Schlup*, 513 U.S. at 329). *Schlup* involved federal *habeas* proceedings in which a state prisoner who had been sentenced to death raised a procedurally-defaulted constitutional claim, and he sought to satisfy the miscarriage-of-justice inquiry so as to overcome the

procedural default and obtain merits review of that claim. The Supreme Court held such inquiry is satisfied when a constitutional violation "probably resulted in the conviction of one who is actually innocent." *Id*. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Because that formulation used the phrase "probably . . . actually innocent," the Court explained that, to establish the requisite probability, the petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*.

This is identical to the test proposed in Appellant's motion which suggests the standard is satisfied if any reasonable juror reviewing the newly-supplemented record would have a reasonable doubt about his guilt. Concerning this test, the Supreme Court subsequently indicated that

> the *Schlup* standard is demanding and permits review only in the extraordinary case. At the same time, though, the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*House v. Bell*, 547 U.S. 518, 538 (2006).[48]

One notable aspect of the standard, as it has been developed by the Supreme Court, is that it shifts consideration from the reality, or actuality, of the petitioner's guilt or innocence, to an assessment of how reasonable jurors would view the evidence. On its face, "actually innocent" does seem to refer to a factual reality rather than a probabilistic determination of what a reasonable juror would believe. *See* WEBSTER'S NEW WORLD

---

[48] The Court's reference to the "gateway stage" derives from the fact the actual innocence doctrine in federal *habeas* proceedings was developed as a "gateway" through which a petitioner could obtain merits review of an otherwise-barred constitutional claim. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). *See generally State ex rel. Smith v. McBride*, 682 S.E.2d 81, 93 n.44 (W. Va. 2009).

COLLEGE DICTIONARY 14 (3d ed. 1999) (defining "actual" as "existing in reality or in fact; not merely possible, but real"); *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992) (observing that "in a colloquial sense" actual innocence arises "where the State has convicted the wrong person"); *see also* Brief for *Amicus* Pa. District Attorneys Ass'n, at 18 (suggesting this Court focus solely on the factual reality of guilt or innocence). But in our system of justice, the factual truth of past events can be nearly impossible to ascertain with absolute certainty. As a consequence, we must necessarily resort to factual determinations made within certain confidence levels based on the evidence presented at a trial or a hearing – where the specific confidence level required by law depends on the perceived social costs associated with an erroneous finding on the ultimate fact in issue. *See Commonwealth v. Maldonado*, 838 A.2d 710, 714-15 (Pa. 2003).

The Supreme Court's actual-innocence standard employed in *habeas* proceedings to overcome a procedural default was thus phrased nearly 40 years ago in terms of a "colorable showing" or "colorable claim" of factual innocence. *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). *Kuhlmann* drew from scholarship published by Judge Friendly:

> As Judge Friendly explained, a prisoner does not make a colorable showing of innocence "by showing that he might not, or even would not, have been convicted in the absence of evidence claimed to have been unconstitutionally obtained." Rather, the prisoner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt."

*Kuhlmann*, 477 U.S. at 454 n.17 (quoting Henry J. Friendly, *Is Innocence Irrelevant?, Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142 (1970)).

Thus, even *Kuhlmann*'s "colorable showing" language derived from an evaluation of what a trier of fact probably would have done – and after *Kuhlmann* the terminology

became more explicit in this regard. As a consequence, while any attempt to demonstrate *actual* innocence utilizes newly-discovered evidence of *factual* innocence, many years before Section 9543.1 was enacted "actual innocence" in the context of post-conviction proceedings had become a term of art, at least to the extent it referred to the "likely behavior of the trier of fact" rather than factual innocence. *Schlup*, 513 U.S. at 330. This is demonstrated by *Kuhlmann*, *Schlup*, and other Supreme Court cases decided well before 2002, *see, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (characterizing "actual innocence" in terms of whether reasonable jurors would have convicted), and the status of "actual innocence" as a technical term with a specific legal definition has been widely recognized. *See, e.g., In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) ("'Actual innocence' is a legal term of art, which has acquired a technical meaning in the *habeas corpus* context."). It should therefore be construed according to that specialized meaning. *See* 1 Pa.C.S. § 1903(a).

In light of the above, I agree with the parties to the extent they advance that "actual innocence," as used in Section 9543.1, refers to the idea that no properly-instructed reasonable juror reviewing the newly-supplemented record would convict. With that said, I have some hesitation about the "more likely than not" qualifier. Although some jurisdictions have adopted it in the DNA context,[49] other jurisdictions construing their own statutes have instead favored a clear-and-convincing-evidence standard.[50] In our

---

[49] *Rhoades v. State*, 220 P.3d 1066, 1072 (Idaho 2009); *People v. Edwards*, 969 N.E.2d 829, 836 (Ill. 2012); *Riley v. State*, 819 N.W.2d 162, 170 (Minn. 2012); *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 216 (Mo. 2001) (*en banc*), *overruled on other grounds, State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 517 (Mo. 2010) (*en banc*); *Berry v. State*, 363 P.3d 1148, 1154 (Nev. 2015); *State v. Hobbs*, 518 P.3d 489, 492 (N.M. 2022); *see also Beauclair v. State*, 419 P.3d 1180, 1189 (Kan. 2018) (quoting KAN. STAT. § 60-1507).

[50] *E.g.*, *In re Watford*, 809 S.E.2d 651, 657 & n.12 (Va. 2018) (distinguishing Virginia's scheme from the "less demanding 'more likely than not' standard used by federal habeas (continued…)

jurisdiction, the Legislature has specified that the applicant must make a *prima facie* case demonstrating exculpatory results would establish actual innocence. *See* 42 Pa.C.S. § 9543.1(c)(3). Hence, the focus should be on the meaning of that term rather than "more likely than not" or "clear and convincing evidence."

In some settings, the *prima facie* terminology is used in burden-shifting schemes to mean, essentially, enough substantive evidence to require rebuttal by the opposing party. *See, e.g.*, *McNeil v. Jordan*, 894 A.2d 1260, 1273 (Pa. 2006) (employment law); *500 James Hance Court*, 33 A.3d at 573-74 (Prevailing Wage Act coverage of a construction project); *Office of Disciplinary Counsel v. Price*, 732 A.2d 599, 604 (Pa. 1999) (knowingly false statements by an attorney). In criminal law, it most often applies to a potential guilt, not innocence. *See, e.g.*, *In re Ajaj*, 288 A.3d 94, 97 (Pa. 2023) (explaining a person who files a private criminal complaint must initially set forth a *prima facie* case of criminal conduct); *Commonwealth v. Ludwig*, 874 A.2d 623, 631 (Pa. 2005) (recounting that under Rules of Criminal Procedure 542(D) and 543(A), to detain a defendant charged with a crime the Commonwealth must establish a *prima facie* case of guilt at a preliminary hearing). Presently, where proof of guilt and burden shifting are not in view, the statutory meaning of a "*prima facie* case" should be evaluated based on its

---

courts); *see also Brookings v. State*, 922 A.2d 389, 391 (Del. 2007); *In re Allen*, 366 S.W.3d 696 (Tex. 2012).

In *Allen*, the Texas court explained that in habeas proceedings a "bare claim of actual innocence," known as a *Herrera* claim, *id*. at 704, requires clear and convincing evidence that no rational juror would have convicted. By contrast, the more-likely-than-not standard applies to innocence claims tied to a constitutional error at trial, such as the withholding of evidence by the prosecution in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). These are known as *Schlup* claims, where the lower standard is justified "because the conviction 'may not be entitled to the same degree of respect of one . . . that is the product of an error-free trial.'" *Allen*, 366 S.W.3d at 705 (quoting *Schlup*, 513 U.S. at 316); *see Ex Parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring).

context.  *See Dep't of Corr. v. Lynn*, 306 A.3d 338, 355 (Pa. 2023) (recognizing that statutory words and phrases should be considered within their context).

Our most important contextual clue is that a court entertaining a DNA testing motion for which all other threshold requirements have been met must nonetheless refuse such testing if it determines there is "no reasonable possibility" it would produce exculpatory evidence establishing actual innocence. *Id*. § 9543.1(d)(2).  Considering this, the *en banc* intermediate court concluded the question is whether it is reasonable to believe some results could prove innocence.  *See Payne*, 129 A.3d at 563.  I agree and conclude, on that basis, that a DNA testing applicant presents a *prima facie* case in compliance with Section 9543.1(c)(3) where the applicant identifies the exculpatory results that could, within reason, be obtained from the testing sought, such that every rational, properly-instructed jury presented with those results, together with all of the other trial evidence, would acquit.

### 2. . . . *assuming exculpatory results*

The DNA court must make the determination of whether the petitioner has set forth a *prima facie* case of actual innocence by assuming the DNA testing will yield exculpatory results, *see* 42 Pa.C.S. § 9543.1(c)(3)(ii), unless it finds there is no reasonable possibility of obtaining such results, *see id*. § 9543.1(d)(2).  Exculpatory results are those that tend to establish innocence or negate guilt.  *Accord State v. Hobbs*, 518 P.3d 489, 497 (N.M. 2022); *cf. Commonwealth v. Flor*, 259 A.3d 891, 909 (Pa. 2021) (reaching the same conclusion with regard to the term "exculpatory evidence" as used in the PCRA, namely, in 42 Pa.C.S. § 9543(a)(2)(vi)).  Exculpatory evidence tends to establish innocence intrinsically, as differentiated from that which, although perhaps favorable, "is merely collateral or impeaching." *Commonwealth v. Gee*, 354 A.2d 875, 878 (Pa. 1976) (internal quotation marks and citations omitted).  Evidence does not establish innocence

intrinsically if its sole prospective exculpatory value depends on a third party reacting to it by confessing to the underlying offense. And nothing in Section 9543.1 suggests that "exculpatory results [that] would establish the applicant's actual innocence" sweeps in speculative responses by third parties. To the contrary, it is the DNA testing itself which, assuming exculpatory results, must establish the applicant's actual innocence. *See* 42 Pa.C.S. § 9543.1(c)(3)(ii). Where, as here, a victim is known to have been unlawfully killed and the central question is the identity of the killer, exculpatory results are those that tend to show the defendant did not kill the victim.

## B. Application to this case

The evidence necessary to present a *prima facie* case demonstrating actual innocence is necessarily fact-specific and as such it must be assessed according to the trial record in each case. *Accord Payne*, 129 A.3d at 559 (explaining "the quantum of evidence necessary . . . above and beyond the absence of the petitioner's DNA has been, and should continue to be, determined on a case-by-case basis"). In this particular matter the circumstantial evidence implicating Appellant in Deborah's death is substantial and powerful, but there is no direct eyewitness testimony of his participation nor is there any physical evidence linking him to the crime. Further, what forensic testing did occur at the time of trial excluded Appellant as a DNA, fingerprint, or footprint donor. The question becomes then, whether a fresh round of DNA testing on all of the evidence presently eligible for retesting, if it produced exculpatory results, would result in any rational juror having a reasonable doubt about Appellant's guilt.

Here, the concept of exculpatory results is colored by the fact that all of the forensic testing done at the time of trial excluded Appellant. As such, he is not trying to establish innocence by suggesting new testing will reveal he was implicated based on a false

positive.[51]  Additionally, there are any number of ways an innocent person's DNA could have ended up on the twine, the truck, or Deborah's clothing.  The twine was from the factory and it could have been touched by multiple factory workers, including those who cut it from the stacked shipping containers, or those who moved it thereafter.  As for the victim's clothing and fingernail scrapings, there is no dispute Logan was in an intimate relationship with Deborah at the time, and that he had sexual relations with her on the day in question; thus, it would not be surprising if his DNA ended up on her clothing and underneath her fingernails, and this would be entirely compatible with his innocence.  The record also establishes Logan was one of the first persons to arrive at the truck, even before the police.  Once he saw his girlfriend's body inside, he touched the truck in various places, trying to get in the back and then climbing around on the inside once he had entered through one of the front doors.  Hence, the presence of Logan's DNA on these items would not exonerate Appellant.  Separately, the lack of Appellant's DNA on items of evidence would not establish actual innocence.  He was seen with a surgical glove on the day in question, and the jury convicted him notwithstanding that the DNA evidence performed at the time of trial excluded him as a donor from the bloodstain on Deborah's shirt and her fingernail scrapings.

Nevertheless, I believe that on this record there is at least one avenue for new DNA testing to raise a reasonable doubt about Appellant's guilt, particularly in light of the conflicting evidence as to Deborah's time of death and whether it could be stated to a reasonable degree of scientific certainty that the soil on her clothing matched the samples taken from the factory floor.  Specifically, it is possible the killer, if not Appellant, left DNA on items such as Deborah's car keys, the octagonal bolt, the twine found around her neck,

---

[51] False positives can result from mistakes at the testing lab, such as when samples are contaminated, mixed, or mislabeled.  *See generally State v. Pierce*, 597 N.E.2d 107, 113 (Ohio 1992).

her clothing (particularly the blood stain), and under her fingernails. If testing were to reveal, consistent with Appellant's redundancy theory, that the DNA of another person was left on many of these items, then perhaps it could be said that any reasonable juror considering *those* results, together with all of the other evidence adduced at trial, would have a reasonable doubt about Appellant's guilt.[52] Although the probability of such results may appear remote, I cannot say that there is "*no* reasonable possibility" of such an outcome. 42 Pa.C.S. § 9543.1(d)(2) (emphasis added), *see generally Payne*, 129 A.3d at 563 (proffering that Section 9543.1 is designed to "afford a petitioner the opportunity to demonstrate the unlikely" (emphasis omitted)), and even a small chance of exoneration is enough to implicate testing in light of our "societal judgment that, given the severe loss that occurs when an individual is erroneously convicted of a crime, the public should bear virtually the entire risk of error." *Maldonado*, 838 A.2d at 715. *See generally* Brief for *amicus* The Innocence Network, at 4, 8-24 (asserting that DNA testing has led to 375 exonerations across the United States and describing several examples).

## VI. Conclusion

For the reasons given above, I would vacate the order of the Superior Court and remand the matter to the common pleas court for further proceedings on the issue of Appellant's motivation and the timeliness of the motion. I would direct that the factual development by the DNA court also encompass testimony concerning the allegations in the Keel affidavit. Additionally, I would direct that if that court ultimately were to conclude that Appellant's motion was timely and was filed in a genuine effort to establish innocence, it should order DNA testing of the previously-untested items of evidence identified above,

---

[52] However, Appellant's confession theory as a basis for new DNA testing is not viable. Section 9543.1 requires a *prima facie* case of actual innocence based on the trial record supplemented by exculpatory testing results; the statute does not permit the DNA court to assume a third party will confess the crime as the basis for determining whether the applicant is entitled to testing.

as well as the previously-tested items that are eligible for additional testing if it were to find as a predicate that "newer technology could provide substantially more accurate . . . results" when applied to those items. 42 Pa.C.S. § 9543.1(a)(2). Finally, I would clarify that any testing ordered should comply with the requirements of subsections 9543.1(d) and (e) of the Judicial Code, *see* 42 Pa.C.S. § 9543.1(d), (e), which relate, respectively, to the court's order and to testing procedures.

Justices Dougherty and Brobson join this concurring and dissenting opinion.

APPENDIX

**Act of Oct. 24, 2018, P.L. 896, No. 147**
Session of 2018
No. 2018-147

\* \* \* \* \*

Section 1.  Section 9543.1 of Title 42 of the Pennsylvania
Consolidated Statutes is amended to read:
§ 9543.1.  Postconviction DNA testing.
  (a)  Motion.--
    (1)  An individual convicted of a criminal offense in a
court of this Commonwealth [and serving a term of
imprisonment or awaiting execution because of a sentence of
death] may apply by making a written motion to the sentencing
court **at any time** for the performance of forensic DNA testing
on specific evidence that is related to the investigation or
prosecution that resulted in the judgment of conviction.
    (2)  The evidence may have been discovered either prior
to or after the applicant's conviction. The evidence shall be
available for testing as of the date of the motion. If the
evidence was discovered prior to the applicant's conviction,
the evidence shall not have been subject to the DNA testing
requested because the technology for testing was not in
existence at the time of the trial or the applicant's counsel
did not seek testing at the time of the trial in a case where
a verdict was rendered on or before January 1, 1995, **or
the evidence was subject to the testing, but newer
technology could provide substantially more accurate and
substantially probative results,** or the applicant's counsel
sought funds from the court to pay for the testing because
his client was indigent and the court refused the request
despite the client's indigency.
    **(3)  A request for DNA testing under this section shall
be by written petition and shall be filed with the clerk of
courts of the judicial district where the sentence is
imposed.**
    **(4)  DNA testing may be sought at any time if the motion
is made in a timely manner and for the purpose of
demonstrating the applicant's actual innocence and not to
delay the execution of sentence or administration of justice.**
    **(5)  Notwithstanding any other provision of law, a plea
of guilty to a crime of violence, as defined in section
9714(g) (relating to sentences for second and subsequent
offenses), or a confession given by an applicant concerning**

the offense for which the applicant was convicted, shall not prohibit the applicant from asserting actual innocence under subsection (c)(2) or the court from making a determination and ordering DNA testing under subsection (d)(2).

**(6)  The motion shall explain how, after review of the record of the applicant's trial, there is a reasonable possibility if the applicant is under State supervision, or there is a reasonable probability if the applicant is not under State supervision, or after review of the record of the applicant's guilty plea there is a reasonable probability, that the testing would produce exculpatory evidence that would establish:**

**(i)  the applicant's actual innocence of the offense for which the applicant was convicted;**

**(ii)  in a capital case, the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) (relating to sentencing procedure for murder of the first degree) if the applicant's exoneration of the conduct would result in vacating a sentence of death; or**

**(iii)  in a capital case, a mitigating circumstance under section 9711(e)(7) under the circumstances set forth in section 9711(c)(1)(iv).**

(b)  Notice to the Commonwealth.--

(1)  Upon receipt of a motion under subsection (a), the court shall notify the Commonwealth and shall afford the Commonwealth an opportunity to respond to the motion.

(2)  Upon receipt of a motion under subsection (a) or notice of the motion, as applicable, the Commonwealth and the court shall take the steps reasonably necessary to ensure that any remaining biological material in the possession of the Commonwealth or the court is preserved pending the completion of the proceedings under this section.

(c)  Requirements.--In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1)  (i)  specify the evidence to be tested;

(ii)  state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii)  acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2)  (i)  **in a sworn statement subject to the penalties under 18 Pa.C.S. §§ 4902 (relating to perjury) and 4903 (relating to false swearing),** assert the

applicant's actual innocence of the offense for which the applicant was convicted **and that the applicant seeks DNA testing for the purpose of demonstrating the applicant's actual innocence**; and

    (ii)  in a capital case:

        (A)  assert the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) [(relating to sentencing procedure for murder of the first degree)] if the applicant's exoneration of the conduct would result in vacating a sentence of death; or

        (B)  assert that the outcome of the DNA testing would establish a mitigating circumstance under section 9711(e)(7) if that mitigating circumstance was presented to the sentencing judge or jury and facts as to that issue were in dispute at the sentencing hearing.

(3)  present a prima facie case demonstrating that the:

    (i)  identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

    (ii)  DNA testing of the specific evidence, assuming exculpatory results, would establish:

        (A)  the applicant's actual innocence of the offense for which the applicant was convicted;

        (B)  in a capital case, the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) if the applicant's exoneration of the conduct would result in vacating a sentence of death; or

        (C)  in a capital case, a mitigating circumstance under section 9711(e)(7) under the circumstances set forth in [subsection (c)(1)(iv)] **section 9711(c)(1)(iv)**.

(d)  Order.--

  (1)  Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

      (i)  requirements of subsection (c) have been met;

(ii)   evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii)   motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(2)   The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility **for an applicant under State supervision, or there is no reasonable probability for an applicant not under State supervision, or after review of the record of the applicant's guilty plea, the court determines that there is no reasonable probability,** that the testing would produce exculpatory evidence that:

(i)   would establish the applicant's actual innocence of the offense for which the applicant was convicted;

(ii)   in a capital case, would establish the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) if the applicant's exoneration of the conduct would result in vacating a sentence of death; or

(iii)   in a capital case, would establish a mitigating circumstance under section 9711(e)(7) under the circumstances set forth in [subsection (c)(1)(iv)] **section 9711(c)(1)(iv).**

**(3)   Any DNA testing order under this section shall constitute a final order. An applicant or the Commonwealth may appeal a decision denying or granting a DNA testing order in accordance with the Pennsylvania Rules of Appellate Procedure.**

**(4)   Any decision granting or denying a DNA testing order shall include an explanation by the court of how the testing requested in a motion under subsection (a) has met or fails to have met the requirements under paragraphs (1), (2) and (3).**

**(5)   Upon determining the petitioner has met the applicable burden established in paragraph (1) or (2), the court may require the Commonwealth to prepare an inventory of evidence related to the case and serve a copy of the inventory to the prosecution, the applicant, the applicant's attorney, if applicable, and the court. The inventory may include, but not be limited to, a list of evidence collected and forensic testing previously done relating to the evidence and the names of agencies that conducted the forensic testing.**

(e)  Testing procedures.--
    (1)  Any DNA testing ordered under this section shall be conducted by:
        (i)  a laboratory mutually selected by the Commonwealth and the applicant;
        (ii)  **a laboratory selected by the court that ordered the testing** if the Commonwealth and the applicant are unable to agree on a laboratory[, a laboratory selected by the court that ordered the testing]; or
        (iii)  if the applicant is indigent, the testing shall be conducted by the Pennsylvania State Police or, at the Pennsylvania State Police's sole discretion, by a laboratory designated by the Pennsylvania State Police.
    (2)  The costs of any testing ordered under this section shall be paid:
        (i)  by the applicant; or
        (ii)  in the case of an applicant who is indigent, by the Commonwealth of Pennsylvania.
    (3)  [Testing conducted by the Pennsylvania State Police shall be carried out in accordance with the protocols and procedures established by the Pennsylvania State Police.] **To the extent possible and not inconsistent with best laboratory practices, the testing shall be conducted in a manner that ensures that some portion of the sample is preserved for replication of testing. If the laboratory determines it may be necessary to consume the entirety of any sample during testing, the laboratory shall inform the prosecution, the applicant and the applicant's attorney, if applicable, of its recommendation and obtain the prosecution and the applicant's consent before proceeding. If the prosecution and the applicant do not consent, the court may issue any appropriate order before testing proceeds.**
    **(4)  If testing is performed by a private laboratory and a DNA database search is anticipated, the applicant shall ensure that the chosen laboratory is accredited by an accreditation body that is a signatory to the International Laboratory Accreditation Cooperation Mutual Recognition Agreement that is designated by the Federal Bureau of Investigation in accordance with 34 U.S.C. § 12591 (relating to quality assurance and proficiency testing standards), that requires conformance to forensic science requirements and that the accreditation include DNA testing, and is compliant with Federal Bureau of Investigation quality assurance standards.**
    **(5)  When testing is performed by a private laboratory, the public laboratory shall take all reasonable measures before the testing is conducted to ensure that the results of**

the testing may be entered into CODIS so that a comparison to known offender or crime scene profiles may be made if the laboratory and test results otherwise satisfy the criteria for database entry.

**(6)   Testing conducted by the Pennsylvania State Police shall be carried out in accordance with the protocols and procedures established by the Pennsylvania State Police.**

**(7)   To the extent possible, if communication with the parties regarding the testing process and test results is necessary, the testing laboratory shall communicate with counsel for petitioner and the Commonwealth simultaneously.**

**(8)   No direct communication involving the testing laboratory without the inclusion of a representative of each party shall occur.**

(f)   Posttesting procedures.--

(1)   After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the [60-day] **one-year** period beginning on the date on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief).

(2)   Upon receipt of a petition filed under paragraph (1), the court shall consider the petition along with any answer filed by the Commonwealth and shall conduct a hearing thereon.

(3)   In any hearing on a petition for postconviction relief filed under paragraph (1), the court shall determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi).

**(4)   If testing complies with Federal Bureau of Investigation requirements and the data meets NDIS criteria, profiles obtained from the testing shall be searched or uploaded to CODIS.**

**(5)   When testing is conducted by a private laboratory, a court may order a public laboratory with access to CODIS to take the necessary measures to ensure the DNA profile obtained from probative biological material from crime scene evidence can be uploaded to CODIS by the public laboratory. Necessary measures may include requiring the public laboratory to conduct a review of the private laboratory's facilities or records to ensure that the private laboratory complies with Federal Bureau of Investigation requirements regarding CODIS. If the private laboratory meets Federal Bureau of Investigation and CODIS requirements, the court may order the public laboratory to upload the DNA profile to**

determine whether the profile matches a profile of a known individual or a profile from an unsolved crime. The DNA profile submitted to the databases must comply with the Federal Bureau of Investigation requirements for the uploading of DNA profiles to CODIS, and the Commonwealth shall take all reasonable measures to ensure that the testing complies with the requirements.

(6) If DNA testing conclusively identifies the DNA profile of the applicant on probative and inculpatory evidence, the court shall dismiss the petition and may make any further orders that are appropriate. An order under this paragraph may:

(i) direct that the Pennsylvania Board of Probation and Parole[53] be notified of the test results; or

(ii) mandate that the applicant's DNA profile be added to the Commonwealth's convicted offender database.

(g) Effect of motion.--The filing of a motion for forensic DNA testing pursuant to subsection (a) shall have the following effect:

(1) The filing of the motion shall constitute the applicant's consent to provide samples of bodily fluid for use in the DNA testing.

(2) The data from any DNA samples or test results obtained as a result of the motion may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(h) Definitions.--As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Applicant." The individual who files a motion under subsection (a).

"CODIS." The Combined DNA Index System administered by the Federal Bureau of Investigation that allows for the storage and exchange of DNA records submitted by Federal, State and local forensic DNA laboratories.

"DNA." Deoxyribonucleic acid.

"NDIS." The National DNA Index System which is the national DNA database system of DNA records and meets Federal quality assurance and privacy standards.

"Public laboratory." The Pennsylvania State Police Forensic DNA Division, the Philadelphia Police Department Forensic

---

[53] In 2021 the General Assembly changed "Board of Probation and Parole" to "Parole Board." *See* Act of June 30, 2021, P.L. 260, No. 59, § 2. That is the only change Act 2021-59 made to Section 9543.1.

**Science Bureau, the Allegheny County Medical Examiner's Office or any other laboratory maintained by the Commonwealth with access to CODIS.**

\* \* \* \* \*

APPROVED--The 24th day of October, A.D. 2018.